[No. S004697. Crim. No. 24685. Mar. 8, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT EDWARD STANSBURY, Defendant and Appellant.

## COUNSEL

Robert M. Westberg, under appointment by the Supreme Court, Pillsbury, Madison & Sutro, David S. Winton, Joseph A. Hearst and David H. Bromfield for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama and John A. Gordnier, Assistant Attorneys General, Dane R. Gillette, Morris Beatus and Eileen Bunney, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**—Defendant Robert Edward Stansbury was convicted by jury of the first degree murder (Pen. Code, § 187)[1] of Robyn Jackson; lewd act on a child under the age of 14 (§ 288, subd. (b)); rape (§ 261, subd. (2); and kidnapping (§ 207). The jury found true three special circumstance allegations: murder in the commission of a kidnapping (§ 190.2, subd. (a)(17)(ii)); murder in the commission of rape (§ 190.2, subd. (a)(17)(iii)); and murder in the commission of a lewd act on a child (§ 190.2, subd. (a)(17)(v)). The jury also found true allegations that defendant had inflicted great bodily injury in connection with the noncapital offenses (§§ 1203.075, 12022.7, 12022.8) and that defendant committed the offenses while on parole (§§ 1203.085, subd. (a), 3000).

The jury fixed the penalty at death. This appeal is automatic. We conclude that we should affirm the judgment in its entirety.

### I. FACTS

#### A. *Guilt Phase*

##### 1. *Prosecution Case*

On September 28, 1982, defendant, a tall red-headed man with a beard, drove an ice cream truck on a sales route around the Baldwin Park neighborhood of Los Angeles. He accidentally drove the truck into a fence around

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

5 p.m. and he cooperated with the property owner in trying to fix the fence. The owner observed nothing wrong with defendant's truck; it appeared to operate normally. Defendant left the scene between 5:30 and 5:45 p.m. A competing ice cream truck driver also saw defendant in the neighborhood that afternoon, and again, his truck appeared to be functioning well and traveling at speed.

Robyn went to the Geddes School in Baldwin Park around 6 p.m. that evening. A neighbor saw a white ice cream truck near the school about that time, and the neighbor's son saw Robyn talking to the ice cream truck driver in front of the school. The boy looked away, and when he looked back, Robyn was not to be seen and the truck was making a U-turn and driving away. He identified the driver as a man with red hair and a beard. The child said that Robyn often talked to the ice cream truck driver and, unlike any of the other neighborhood children, received gifts of candy and ice cream from him. He identified a picture of defendant as he looked with long hair and a beard as the driver of the ice cream truck Robyn frequented.

Beverly Allen, a gas station attendant, saw a large white ice cream truck arrive at her station about 6:30 p.m. on September 28, 1982. Her Sears U.S.A. gas station was located in Covina, and she saw the truck arrive from the east on Arrow Highway. She saw a young man (not defendant) with blond hair buy gas and ask someone in the truck to be dropped off by the freeway. Mrs. Allen saw defendant standing by the passenger door of the truck, and observed Robyn inside, looking unhappy. Mrs. Allen was somewhat uncertain about her identification of defendant.

Defendant did not return to his home in Pomona until 9 p.m. that evening. He borrowed his roommate's turquoise automobile around midnight, first driving it next to his truck for a few minutes. He returned around 3 a.m.

About 1:15 a.m. Andrew Zimmerman saw the turquoise car in Pasadena. He saw a large person get out of the car, the door of which made a memorable popping sound, and throw something in a flood control channel. Mr. Zimmerman telephoned the police, who arrived about 1:30 to discover the body of Robyn in the flood control channel. Mr. Zimmerman positively identified defendant's roommate's car as the one he had seen that night.

There was medical evidence that before her death, Robyn had been put in a cold, oxygen-deprived environment, such as an ice cream freezer. There was evidence of a rape, and there was evidence of saliva deposited by a nonsecretor on the victim's genital area and nipple. The victim was a secretor; defendant, like only 20 percent of the population, was not. The

cause of death was asphyxia complicated by blunt force trauma to the head. The coroner was of the opinion that Robyn died when her head struck the concrete floor of the flood control channel.

Defendant spoke to the police on the night after the crime, and said he had seen Robyn the day before about 6 p.m. He said he left her about that time, and continued his route. He said his truck had not been operating properly, and he had been compelled to take a circuitous route home via the Arrow Highway, to avoid hills. He said he stopped for gas at an off-brand station on the Arrow Highway. He explained that he spent the evening watching television and dozing, and that when he woke around midnight, he borrowed his roommate's car to go get something to eat at the Sambo's restaurant on Indian Hill Boulevard in Claremont. A waitress who worked at that restaurant and was familiar with defendant testified that he had not been there that night.

A Los Angeles County jail inmate testified that defendant told him he had offered a little girl some ice cream or candy to get her to go around and sell his wares with him. Defendant said he was being charged with the murder of this little girl.

### 2. *Defense Case*

Defendant testified in his own behalf. He confirmed that he had been in the Baldwin Park neighborhood on September 28, 1982. His ice cream truck developed engine trouble in midafternoon. He saw Robyn around 6:15, when she asked him for candy. He often gave free candy or ice cream to poor children. He left her by the Geddes School, and continued on his route, making a few more sales. Then he headed home, traveling between five and seven miles per hour. He did not go home via Arrow Highway, as he admitted he had previously told the police, but by another route. He bought gas at a Shell station on Azusa Avenue, not at Beverly Allen's Sears U.S.A. station. It was stipulated that a receipt for gas bought at this Shell station on that date was found in his ice cream truck.

Defendant testified that he returned home around 9 p.m., and when his roommate awoke him around midnight, asked to borrow the roommate's car. He pulled the car out, stopped near his truck for cigarettes, then went to the Sambo's restaurant on Central Avenue in Chino. He denied telling the police he had gone to the Sambo's on Indian Hill. He stopped at a gas station to buy gas for the next day, when he planned to ask for the loan of the car again. At the gas station, a woman approached him and asked for a ride, which he provided. This woman testified, confirming that she received a ride from defendant about 1:50 a.m.

There was some evidence that it would have been difficult to pump gas into defendant's truck from the position in which Mrs. Allen observed it. There was also evidence that the lighting conditions at the place Mr. Zimmerman observed the turquoise car would tend to distort colors. A defense medical expert was of the opinion that the victim had died before she was thrown into the channel, between 7:30 and 8:30 p.m., and that the cause of death was strangulation. He said there was no evidence that the child had been in a cold, oxygen-deprived environment before her death.

There was no physical evidence of the victim's presence in defendant's truck. There was also no physical evidence of defendant's presence in the truck, which was extremely dirty.

### B. *Penalty Phase Evidence*

The prosecutor presented evidence that when defendant was 20 years old, he violently assaulted and sexually abused 2 boys, then ages 10 and 9. He threatened to kill the children, and forced one to dig a grave. Defendant was convicted of lewd conduct with a child for these activities. Another witness described defendant's crimes against her; he offered to help her after she experienced car trouble, but instead beat her, raped her, and took her valuables. He held a knife to her back and spoke of disposing of her body. He was convicted of rape, robbery and kidnapping.

Both witnesses spoke of their humiliation, rage and fear after these traumatic events.

Evidence was also presented of defendant's convictions for the armed rape of a 14-year-old girl, for a later offense of kidnap and rape of an adult woman, and for possession of a firearm by an ex-felon.

Defendant's parole officer testified that defendant told him he was unemployed. The officer testified that he would not have permitted defendant to be employed as an ice cream truck driver in light of his history of violent sexual offenses against children.

Defendant presented no evidence and did not argue to the jury.

## II. Guilt Issues

### A. *Faretta Claims*

#### 1. *Alleged Interference With Defendant's Right of Self-representation.*

Defendant claims that the court so interfered with his Sixth Amendment right under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95

S.Ct. 2525] (hereafter *Faretta*) to represent himself, that the entire judgment must be reversed. We disagree.

Jury selection began on January 7, 1985. The issue of who would represent defendant and under what terms, however, had occupied a significant part of the pretrial proceedings.

From the date of the arraignment on November 23, 1982, until a conflict of interest was declared on July 7, 1983, defendant was represented by the public defender. On the latter date the court relieved the public defender and appointed Attorney David J. Daugherty to represent defendant. On September 12, 1983, the court granted defendant pro se privileges in county jail, but otherwise continued his representation by Daugherty. On May 7, 1984, the court appointed Attorney Anthony R. Robusto as cocounsel with Daugherty.

Defendant subsequently filed a motion to represent himself pursuant to *Faretta, supra,* 422 U.S. 806. At an in camera hearing on July 31, 1984, after lengthy discussions of the matter with defendant, the court offered him four options. First, the court offered defendant "pure" *Faretta* status, i.e., he would be allowed to represent himself without the assistance of any lawyer. Second, the court offered to allow defendant to represent himself with the assistance of both Daugherty and Robusto as "advisory counsel." The court explained that advisory counsel would not be permitted to participate directly in the trial as advocates, but that defendant could confer with them at any time during the proceedings on questions of law or tactics, e.g., how to question certain witnesses and what motions to make. Third, the court offered to allow the defendant to represent himself with one of his two lawyers as his "cocounsel." As authority for the offer, the court drew an analogy to its statutory power to appoint a cocounsel for a capital defendant's appointed counsel—here, defendant representing himself—if the case warrants it. (§ 987, subd. (d).) The court explained that in contrast to "advisory counsel," cocounsel would have the right to participate directly in the trial, e.g., by examining witnesses or addressing the court or jury. Fourth, the court offered to continue matters as they were, i.e., with defendant as the client and Daugherty and Robusto as his lawyers.

Seeking clarification of the third option, defendant asked whether he would be allowed to act as chief or lead counsel if his lawyer was appointed as his cocounsel. The court replied that he would. Defendant then asked if such status as chief counsel would give him "the right to make any final decisions in the matter . . . regardless of how foolish they may be." The court said that it would. The court explained, however, that if defendant and his lawyer became cocounsel, they would be required during the trial to elect

which of them would conduct the examination of any given witness or make any given motion; either, but not both, would be allowed to do so in each instance.

With these understandings defendant chose the third option, i.e., to become cocounsel with Daugherty but to act as lead counsel of the team. The court specifically found that defendant knowingly and intelligently waived his right to be represented by counsel—indeed, by two counsel—and elected to substitute himself as one of those counsel, and to proceed with Daugherty as his cocounsel and himself as his chief counsel. The court then formally granted defendant's motion to proceed in propria persona and appointed Daugherty as his cocounsel. Finally, the court directed Robusto to serve as advisory counsel.

During the ensuing three months the court held numerous pretrial hearings on motions made either by defendant or by Daugherty. On the basis of that experience the court became concerned about an apparently growing conflict between defendant and Daugherty over the substance and strategy of the defense. The court expressed doubts that the arrangement—i.e., with defendant and Daugherty acting as cocounsel—would be workable when the proceedings reached the trial stage; the court also doubted that defendant's right to represent himself included a constitutional right to a full-fledged cocounsel as well as an advisory counsel. At an in camera hearing on November 7, 1984, after further lengthy discussions of the matter with defendant, the court reaffirmed defendant's pro se status and relieved Daugherty as his cocounsel. At defendant's insistence, however, the court immediately reappointed Daugherty as "assistant counsel" for defendant. The court explained that defendant would thereafter have the power to "make all the decisions" concerning the conduct of the defense, and that Daugherty as assistant counsel rather than cocounsel would no longer have any such power. But the court also stated that if defendant asked Daugherty to do so, the court would permit Daugherty to actively participate in all stages of the trial, e.g., by conducting voir dire, examining witnesses, or making arguments to the jury; the sole restriction was that, as before, any given examination could be conducted either by defendant or by Daugherty but not by both.[2] The new arrangement remained in force throughout the rest of the pretrial proceedings and the trial.[3]

■ Defendant first contends that although the court granted his *Faretta* motion, it thereafter conducted the proceedings in such a way as to deprive

[2]The court also relieved Robusto as "advisory counsel," except that defendant could call on him to present any matter that he had specially prepared. Defendant did so several times in the course of trial.

[3]Jury selection began on January 7, 1985, and the trial ended on July 15, 1985.

him of effective control over his defense and make his *Faretta* right an empty formality.[4] The record refutes this claim. As noted above, when the court authorized defendant to act as chief counsel with Daugherty as his cocounsel, and again when the court recognized defendant as sole counsel with Daugherty as his assistant, the court made it clear that it was defendant who was actually in charge of the conduct of the defense. On both occasions Daugherty expressly accepted his appointment with that understanding. At numerous points thereafter the court reaffirmed defendant's sole right to control the content and presentation of the defense, Daugherty acknowledged that defendant had that right, and both the court and Daugherty observed that defendant was in fact exercising that right. More important, the record confirms their observations.

To begin with, it plainly appears that at all stages of the proceedings defendant personally and actively participated in the conduct of his defense. Almost a year before granting defendant's *Faretta* motion, the court ordered that he be given pro se privileges in county jail. Thereafter—even though defendant was still represented by counsel—the court allowed defendant to file a number of pretrial motions in propria persona, and ruled favorably to him on certain of those motions. After the court granted defendant's *Faretta* motion and at his request appointed Daugherty first as his cocounsel and then as his assistant counsel, the court entertained an even larger number of pretrial motions personally presented by defendant.[5]

At the hearings on the principal pretrial motions defendant himself conducted the examination of 21 witnesses. Defendant personally selected, interviewed, and retained the two law clerks on the defense team.[6] When the case came on for trial it was defendant who prepared the jury questionnaire. During voir dire defendant personally examined a number of the prospective jurors. Defendant then made his own opening statement to the jury. Throughout the trial defendant continued to make and argue numerous additional pro se motions, including several motions to declare a mistrial and to dismiss. During the prosecution's case-in-chief defendant personally cross-examined seven witnesses, including the key prosecution witness Beverly Allen. During the defense case defendant presented and examined 21 witnesses on his behalf. Defendant then made his own closing argument to

[4]Defendant limits this claim to the pretrial proceedings and the guilt phase. As will appear, he takes the opposite position in attacking the penalty portion of the judgment, contending that in the penalty phase the court should have intervened in his case and even terminated his pro se status on its own motion.

[5]For example, on September 27 and October 4, 1984, the court either considered or ruled on a total of more than 30 motions filed by defendant in propria persona.

[6]The defense team was thus composed of defendant acting as his own attorney, together with two additional attorneys, two investigators, two law clerks, and various experts.

the jury. And defendant himself examined additional witnesses both in the penalty phase and at the hearings on posttrial motions.

The record also demonstrates the other half of the equation, i.e., that even after the court granted his *Faretta* motion it allowed defendant to use Daugherty's services in any way he saw fit. In particular, the court let defendant call on Daugherty to act as his counsel at every stage of the proceedings. Thus, Daugherty made and argued a number of pretrial motions for the defense. At the hearings on the principal pretrial motions Daugherty was permitted to conduct the examination of 18 witnesses. Daugherty was allowed to examine the bulk of the prospective jurors on voir dire, as well as the jury-selection experts called by the defense. Like defendant, at trial Daugherty also made opening and closing statements to the jury. Finally, Daugherty was permitted to examine a number of the defense witnesses and to cross-examine the majority of the witnesses in the prosecution's case-in-chief and all the witnesses in the prosecution's rebuttal. In each of the foregoing instances Daugherty's participation in the proceedings was apparently at defendant's request or with his consent. Indeed, in his closing brief in this court defendant expressly denies making any claim that "unsolicited and excessively intrusive participation" by his assistant counsel (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 177 [79 L.Ed.2d 122, 132, 104 S.Ct. 944] [hereafter *McKaskle*]) impaired his right of self-representation.

Instead, defendant contends that right was impaired by actions of the trial court that "usurped defendant's control of defense tactics and strategy." He charges numerous instances of such "usurpation." We have reviewed them all, and find that most are misreadings or exaggerations of the record and the remainder refer to rulings well within the trial court's discretion. Defendant focuses on two main categories of asserted judicial interference with his defense, and we shall discuss those categories in some detail.

Defendant contends that in a number of instances the court "resolved conflicts" between him and Daugherty in favor of the latter. He cites several examples, but none supports his claim. To begin with, in none of these instances did defendant object on the ground he now asserts. And in any event the record is not as defendant portrays it. He claims, for example, that the court repeatedly "accepted Daugherty's representations" that he had furnished defendant with copies of documents that he needed for the defense despite defendant's statement to the contrary. But this was a factual, not a tactical, disagreement. In *McKaskle, supra,* 465 U.S. at page 179 [79 L.Ed.2d at page 134], the Supreme Court declared that *Faretta* rights are adequately vindicated in proceedings outside the jury's presence if, inter alia, "disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the

discretion of counsel." (Fn. omitted.) Whether defendant had or had not received copies of certain documents was not a matter of "discretion" but an ordinary question of fact. The record shows that in resolving that question the court did not defer to counsel's personal judgment but simply tried to determine if defendant had actually received copies of all the documents he needed.[7]

Defendant next complains that when Daugherty announced over defendant's objection that the defense was ready to proceed on its motion to suppress under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (hereafter *Miranda*), the court "compromised defendant's right to control defense tactics" by ordering the hearing to proceed. The record shows, however, that the issue was not in fact one of "tactics" but simply of the timely availability of witnesses. When the court called the *Miranda* motion for hearing, Daugherty stated that the three police witnesses he wished to present were in attendance. Defendant objected on the sole ground that he had specifically requested the presence of several additional police witnesses. The prosecutor explained that the additional witnesses had recently been in the courthouse and stated he would try to secure their attendance at the next day's proceedings. The court replied that whenever additional witnesses were available it would hear their testimony.[8] Defendant voiced no further objection and the hearing began. On the next day the additional witnesses were produced and defendant personally examined them at length. It follows there was no "compromise" of defendant's right to control the tactics of the defense.

■ Finally, defendant complains that the court "acquiesced in Daugherty's decision" that certain pretrial investigations defendant had requested

---

[7]Thus the court asked Daugherty if he had any documents that defendant did not. Daugherty replied that to the best of his knowledge defendant had received copies of all documents in his possession, and that if any other documents turned up he would make sure defendant received them as well. Indeed, Daugherty offered to copy his entire file again for defendant, despite its size and complexity. Seeking a practical solution, the court directed defense investigator Benart to meet with defendant and show him every document in Daugherty's file, to obtain defendant's initials on each document of which he had a copy, and to provide a copy of any that defendant did not have.

Defendant similarly distorts the record in complaining that the court "again deferred to Daugherty's judgment" on the question whether Daugherty had or should have filed certain writ petitions on defendant's behalf. Rather, when the court inquired into the matter Daugherty explained that he had not in fact declined to file such petitions but had simply discussed with defendant the question of the best time to do so, a question that was still unresolved. Daugherty pointed out that the petitions could be filed at any time without prejudice, and offered defendant written instructions on how to file them himself if he wished to do so sooner. Defendant apparently had no wish to file them at that time, however, and was making the point merely to bolster his claim of a breakdown in communications between him and Daugherty.

[8]Far from pressing the defense to put on the motion at that time, the court remarked that "I don't care one way or the other, if you proceed with the motion or not."

were "not justified." Again the record is otherwise. When the court asked defendant which investigations had not been done, defendant focused on his request that Daugherty hire experts to conduct a telephonic survey of residents of the portion of Los Angeles County from which the jurors would be drawn in order to determine what percentage of them remembered reading about the murder of Robyn in the local press.[9] But the court did not merely defer to counsel's judgment in the matter. Instead, Daugherty explained to the court that at the time in question he had been responsible for disbursing court-authorized county funds for paying defense investigators; that he discussed defendant's idea for a telephonic survey with the company that provides such services and learned it would be a major expense, costing up to $20,000; that he was not willing to approve so large an item without specific court authorization; and that the judge to whom the request for authorization was presented declined to grant it. Defendant does not dispute these facts, which fall well short of showing judicial "acquiescence" in a tactical decision by counsel.

In short, defendant points to no instance in which it can be fairly said that the trial court resolved adversely a conflict between him and his counsel when the matter was "one that would be normally be left to the discretion of counsel." (*McKaskle*, *supra*, 465 U.S. at p. 179 [79 L.Ed.2d at p. 134].) On the contrary, the record shows that after the court made defendant solely responsible for the defense and reduced Daugherty's role to that of his assistant, all parties clearly understood and observed their respective rights and duties.[10]

Defendant next contends the court substantially impaired his ability to conduct his defense by threatening to revoke his pro se status in a dispute over tactics. He points to two instances in which he assertedly attempted to stand mute but was told by the court that it would deprive him of his pro se

---

[9]Defendant proposed to use the results of the survey in the forthcoming jury voir dire, i.e., as a ground for challenging the panel of prospective jurors if the panel answered differently the questions asked in the survey.

[10]Thus with some six weeks remaining before trial the court reminded Daugherty and Robusto that "each of you who are assisting him must realize that the decisions that are made in this case are his decisions to make." Robusto acknowledged that defendant "has now acquired all control over this particular case." And Daugherty reviewed the history of his relationship with defendant as follows: when he and defendant were cocounsel it "was a very difficult role because we were pulling against each other. I admit I was trying to direct the lawsuit in what I felt was Mr. Stansbury's best interest. And sometimes we had some conflicts.

"But since there's been a clarification that Mr. Stansbury is in propria persona and he is definitely running this case and I am assisting him, I think he would agree there has been cooperation on my part, and I have directed Mr. Slaick [a defense investigator] for instance, that he does not listen to me. He's directly taking orders from Mr. Stansbury. He's employed by Mr. Stansbury. So is Mr. Benart. So am I."

status unless he put on a defense. He relies on *People* v. *Teron* (1979) 23 Cal.3d 103, 115 [151 Cal.Rptr. 633, 588 P.2d 773], in which we said that a pro se defendant "bears no duty to present a defense. He has the right to plead guilty, even against the advice of counsel. [Citation.] A fortiori, having put the state to its proof, he has no obligation to try to rebut it." (See also *People* v. *McKenzie* (1983) 34 Cal.3d 616, 628 [194 Cal.Rptr. 462, 668 P.2d 769] [dictum].)

■ We have recognized that in some circumstances a defendant representing himself, unlike counsel, may elect to refuse to participate actively in his defense. (*People* v. *Teron*, *supra*, 23 Cal.3d 103, 115; *People* v. *McKenzie*, *supra*, 34 Cal.3d 616; see also *United States* v. *Clark* (7th Cir. 1991) 943 F.2d 775, 782; *Savage* v. *Estelle* (9th Cir. 1990) 924 F.2d 1459, 1464, fn. 10; *United States* v. *McDowell* (6th Cir. 1987) 814 F.2d 245, 250.) We have also observed, however, that when a defendant's threat to stand mute is not motivated by a sincere desire to take that route, but by a desire to disrupt or manipulate the proceedings, the court does not err in terminating the defendant's pro se status. (See *People* v. *Clark* (1992) 3 Cal.4th 41, 114-115 [10 Cal.Rptr.2d 554, 833 P.2d 561.)

■ A reasonable inference that can be drawn from the record is that defendant never actually intended to stand mute at the guilt trial, and that his intermittent threats to do so were simply attempts to pressure the court into agreeing to his procedural demands, to delay the trial, and to interject error into the proceedings.

We examine the record of the two incidents defendant complains of in some detail.

Just before the commencement of voir dire, defendant directed Daugherty to sit in the audience, complaining that there had been a complete breakdown in communication between them. The court offered to relieve Daugherty, but defendant admitted he needed him. He complained that Daugherty had destroyed his defense, and concluded he would have no option but to put on no defense, and "allow the District Attorney to select the jury that he wishes to select and at least attempt to remain mute throughout the trial because of the fact that my defense has been destroyed." He explained his hope that he would obtain a reversal on appeal, and be able to put on a better defense at a second trial.

The court proceeded in camera, patiently trying to determine what it was that made defendant think he should present no defense. Defendant made a rambling complaint that Daugherty had failed to file five writs of prohibition

that were critical to his case, but whose nature he could not immediately recall. The court stated: "Mr. Stansbury, wait a minute. I hate to interrupt. You've been going 20 minutes and you haven't told me anything. [¶] I want you to get to factual matters. I think you're trying to delay the start of this trial. If you have something specific, please state it."

It transpired that defendant wanted writ relief from the court's *in limine* rulings on various evidentiary points and on his request for a continuance. Daugherty had told defendant that the writ petitions did not have to be filed and acted on before the commencement of trial, and defendant apparently did not like this accurate legal advice. Defendant also complained that Daugherty had fired his law clerk; it transpired that the law clerk had taken another job because he was not given enough hours of work on defendant's case. (Daugherty explained to the court that defendant had complete control over all six of his law clerks.)

As the court pressed defendant for details, defendant responded vaguely that he had a "great many disagreements" with Daugherty, and said that because his experience was that the court would not replace Daugherty, it was a waste of his time to try to answer the court's questions specifically. Daugherty stated that defendant's interest in the writ petitions was that they be timed so as to cause a delay of the trial, and that he did not think the complaints about the writs or the law clerks were the real reason for defendant's threat to put on no defense.

The court carefully explained that the pretrial writs were still available to defendant, and stated that it was satisfied by Daugherty's representations about the assistance available to defendant from various law clerks. The court informed defendant that if he wanted Daugherty's help, he would have to allow the man to sit at counsel table. The court also cautioned defendant that he would have to behave properly in front of the jury.

Defendant responded that the issue of his behavior would not come up: "Perhaps the court misunderstood me. [¶] I had no alternative but to allow the court and Mr. Burns [the prosecutor] to go forward and select the jury of Mr. Burns's choice, at which time I would have no alternative but to attempt to remain mute throughout the trial."

The court cautioned defendant that from what it knew of the facts, the People's case could well result in a conviction, and that defendant's failure to participate could seriously limit the issues available on appeal. Daugherty commented that he thought defendant was of the view that "essentially if he sits back and do[es] nothing, he can create error and have a new trial."

Daugherty felt this was a terrible gamble, and asked that defendant be given more time to "ponder his choices."

The court, too, was concerned, and discussed the burdens of pro se status with defendant at length. Then the court said, "if you decide you are not going to participate in this case, . . . I'm going to relieve you of your pro. per. status, and I'm going to direct Mr. Daugherty to proceed on the defense of this matter." The court explained that to put on no defense was basically to plead guilty, that "the risk you take is substantial and I think I become party to that risk if you did elect to sit back and not take any steps to represent or defend yourself."

Defendant explained that he could not proceed with Daugherty as assistant counsel because Daugherty had "ruined" everything, but that to try to defend without Daugherty would not work either, because Daugherty's preparation was in support of some defense defendant did not want. Therefore it was better either to not defend at all, or have the court fire Daugherty and "allow me to have an attorney to assist me that I can have some kind of faith and trust in." The court refused to consider appointing another attorney, because such an appointment would require further continuance. The court noted that it had been five and a half months since defendant had been granted pro se status, plenty of time in which to prepare a defense.

Defendant then said he wanted to present a defense. The court seized on this admission, and explained that this is what it would insist on: "If you are going to stand mute and rely on my previous rulings at this point, up to this point in the trial, I would not allow you to do that. [¶] I think it would be irresponsible for me to allow you to stand mute and let the People present the kind of evidence I know they will present. [¶] And your hope or wishful thinking, whatever flaws in this case are going to be identified by the jury, I think is wishful thinking to the point of being irresponsible."

Defendant agreed with the court that it was wishful thinking to suppose the jury would not convict him if he stood mute, but he argued that a reversal was certain on appeal because of the trial court's errors.

The court responded that a reversal on appeal was not to be counted on, that there was too much at stake, and that it wanted to assure defendant of a fair trial. The court gave defendant until the actual commencement of voir dire to reflect, find authority and convince the court that his was a "legitimate tactic," but gave an indicated ruling that it would not permit defendant to stand mute. The next day, when voir dire was to begin, the court reiterated its ruling that defendant would not be permitted to stand mute.

The record supports the conclusion that defendant lacked a sincere desire not to participate in his defense at the guilt phase of trial. As in *People* v. *Clark, supra,* 3 Cal.4th at page 114, defendant had eagerly sought to defend himself and had a particular defense strategy in mind when he became disgruntled with some of the court's rulings and with his assistant counsel's attitude. He admitted that he would be kidding himself to think he had any chance of prevailing at trial if he put on no defense; rather, he sought to interject error into the trial so that the conviction would be reversed on appeal. At the very least, he was operating under the misapprehension that he was sure to prevail on appeal. Both the court and defendant's assistant counsel expressed the opinion that defendant was simply playing for time.

██ Once a pro se defendant invites advisory counsel to assist him, his standing to complain that counsel interfered with his presentation of a defense sharply diminishes. (*McKaskle, supra,* 465 U.S. at p. 182 [79 L.Ed.2d at pp. 135-136].) The court retains authority to exercise its judgment regarding the extent to which such advisory counsel may participate against defendant's wishes. (*Id.* at p. 178, fn. 8 [79 L.Ed.2d at p. 133]; *People* v. *Clark, supra,* 3 Cal.4th at p. 115.) Similarly, we think that the court retains authority to determine whether defendant's expressed desire to stand mute is sincere, or whether it is an attempt to coerce the court. ██ Here, the court went beyond that task by also expressing the opinion that defendant would not have a fair trial if he stood mute; nonetheless, the court also made it clear that defendant's reason for standing mute was not that he had no defense, or that he thought silence was the best defense, but that he was not pleased with the way things were going and thought he was sure to get a second trial where things would go his way. We see no error in a court refusing to permit a defendant to stand mute at trial, when that defendant is attempting to manipulate the legal system while operating under such a basic misapprehension.

That defendant's desire to stand mute was insincere and manipulative is further demonstrated by his earlier threat to do the same thing. Two months before the commencement of trial, the court indicated that it thought defendant was not entitled to the appointment of two counsel to assist him; after discussion the court appointed Daugherty as assistant counsel and relieved Robusto, who had been appointed in the capacity of advisory counsel. The court added that Robusto could finish working on any matters he had in hand. Defendant immediately threatened to stand mute if he could not have both men assisting him, and if he could not require Daugherty to handle a witness exactly as he, defendant, saw fit. His reason was that the trial court was in error and that the case should proceed rapidly to judgment so that he, defendant, could be vindicated on appeal. He abandoned his position, but his

tendency to attempt to blackmail the court with the threat to stand mute is evident.

Defendant complains of a second instance when his desire to stand mute was met with a threat to revoke his pro se status. At the conclusion of the People's case-in-chief at the guilt trial, defendant complained that his defense witnesses would not be called in a certain order, and that therefore, he preferred to put on no defense and stand mute. The court was understandably stunned, and asked "Because we're down to the point we've got witnesses here and you're now pouting because somehow or another you can't get them in a particular order[?]"

The court continued: "Several times during this trial when things haven't gone exactly your way, you begin to withdraw and you get upset and you indicate you're not going to participate. . . . If you decide you don't want to proceed with your witnesses, then we'll—I'll instruct Mr. Daugherty to proceed with the defense that was originally scheduled by the attorneys that were going to present a defense in this case. [¶] But that's a decision you have to make. Sometimes you have to take witnesses out of order. That's just the way things are."

The court pressed defendant to explain why it was so critical to his defense that his witnesses be called in a certain order, and defendant was utterly unable to do so. The court asked whether defendant would present his defense and defendant persisted: "I'm left with an alternative of no defense because of what is happening here. And I am looking ahead. I see what is happening. I am not totally blind. I have made complaints about this repetitiously since this case has begun with attorney Daugherty."

The court informed defendant that he was simply trying to cloud the record and giving the court a "song and dance" without telling the court what it was he wanted. Defendant grew sulky and repeated that he was thinking of resting the defense. After conferring with assistant counsel, he announced that he would like to rest the defense, but that counsel had informed him that the court would direct assistant counsel to put on the defense he had prepared. Defendant commented that from the court's earlier position, he had no doubt that counsel was right about what the court would do. As he was adamantly opposed to losing his pro se status, he said he would present a defense, but that he needed time to interview some witnesses.

The court pointed out that defendant had had months to interview his witnesses, and that there was no justification for any delay. The court directed defendant to proceed with his witnesses, or have Mr. Daugherty proceed.

Again, the record supports the inference that at this point in the trial, defendant did not sincerely want to abandon his defense. He had a long list of witnesses to be called, and was so concerned about the proper presentation of his defense that he became irrational when he found he could not present the witnesses in a particular order. His stated inclination not to present any defense was not sincere, but was a petulant reaction to being frustrated regarding the order of witnesses.

It is of course true that defendant ultimately *did* stand mute at the penalty trial. But we must examine the trial court's response to his earlier threats to do so in light of the record available to the court at the time it was called upon to rule. In both instances at the guilt trial, as we have seen, the court justifiably thought that defendant was being manipulative, and that his desire to stand mute was not a sincere decision that this would be the best defense, but an attempt to interject error and delay into the proceedings. By contrast, as to defendant's decision to stand mute at the penalty trial, defendant had made it clear throughout the proceedings that if he were convicted, he would seek the death penalty, and that no defense was to be prepared. He was outraged when he found his investigators had done some work on uncovering defense evidence to be presented at the penalty trial; he was consistently adamant that no defense be prepared or presented.

In sum, we see no improper interference with defendant's right to represent himself. Defendant used the threat to stand mute as a weapon when the court ruled against him. The court was within its power to counter that apparently insincere threat with its threat to revoke defendant's pro se status, which, after all, was not inviolate. (*Faretta, supra*, 422 U.S. at p. 835, fn. 46 [45 L.Ed.2d at p. 581]; *People* v. *Clark, supra*, 3 Cal.4th at p. 115.)

### 2. *Impact of Confinement on Self-representation*

■ Defendant complains that the trial court was indifferent to the conditions of his confinement during trial, and that these conditions impaired his ability to represent himself, in violation of the Sixth Amendment of the United States Constitution, article I, section 15 of the California Constitution and *Faretta, supra*, 422 U.S. 806. (See also *Milton* v. *Morris* (9th Cir. 1985) 767 F.2d 1443, 1446.)

The record is otherwise. The court held hearings so that defendant could air his complaints about the availability of books, lighting conditions, the filling of his prescription for eyeglasses, and four security searches that had occurred in his cell. The court intervened in several instances, and made a factual finding that defendant's legal materials had not been disturbed during

two searches, and that defendant had adequate time to reassemble disturbed materials in the case of the searches that did affect his materials. Defendant had two lawyers and several law clerks and investigators at his disposal, as well as access to the law library. He fails to bring to our attention any fact demonstrating that his confinement unfairly impaired his ability to represent himself.

Thus, for example, when defendant complained that the lighting conditions in his cell and the noise in the jail were impairing his ability to work on his case, we conclude the court was justified in responding after a hearing on the matter that the lighting, though not perfect, was adequate, and that the voluminous output of motions defendant had produced from the cell belied his claim. There had been testimony that defendant could read and study in his cell, and that the lighting was adequate in the library and holding cell.

Defendant also complained that he was wasting time and energy riding on the common inmates' bus from downtown Los Angeles to Pomona and back each day of trial, and that during the many hours a day he spent in transit, other inmates verbally abused him. The court again responded after a hearing that the time in transit did not seem to have impaired the defendant's ability to participate, and that defendant was kept away from other prisoners so that he could not be harmed.

And when defendant complained that the library facilities available to him were inadequate, because, for example, pages had been torn out of the books, the court appropriately pointed out that defendant had not only the jail law library at his disposal, but also the assistance of two lawyers and two law clerks who could and did supply him with legal materials.

Defendant's charge that the court failed to intervene on his behalf to mitigate the effect of confinement on his ability to represent himself is contradicted by the record. The court ordered that he be given a typewriter in his cell until jail authorities pointed out it could be dismantled and turned into a weapon. The court determined that defendant would have access to a typewriter in the jail library and also indicated it would accept handwritten motions. The court directed jail authorities to place defendant in a library group in which he would not feel threatened. The court ordered two medical appointments for defendant, and ordered that he receive the glasses he needed. He received three pairs of glasses, in all. Defendant was permitted to use the library by himself on weekends to make up for time in court. The court ordered that special accommodations be made so that defendant could visit the jail store on Fridays, when court was not in session.

As for the searches of defendant's cell, defendant again is unable to show how they impaired his ability to prepare his defense. Defendant complained

that he had been awakened in the night and subjected to a disruptive search on April 26, 1985, but the court found that the search had not impaired his ability to prepare. The court stated that defendant's preparation would be based mainly on the daily transcripts, which were obviously very easy to reassemble. The court commented that defendant had excellent recall and command of the evidence, and that he would have had five days to reassemble his notes by the time they were required for closing argument.

Another search occurred on May 11, 1985, but this time, defendant's complaint was that the searching officer had an animus against him and intended to harass him and interfere with his ability to prepare. Again, defendant had several days to reorganize his materials before they were needed for closing argument. Defendant's complaint that searches on May 23 and May 24, 1985, interfered with his preparation of his opening statement for the penalty phase of trial was not credited. The court held a hearing and took evidence from the searching officers, and apparently believed the latter's testimony that they left defendant's materials in the exact order they found them.

Defendant's claim that he was denied reasonable access to resources necessary to enable him to represent himself cannot be sustained. We are satisfied that the trial court adequately assured such access in defendant's case.

### 3. *Knowing, Intelligent Waiver of Right to Counsel*

■ In the alternative, defendant argues not that his right to represent himself was violated, but that his state and federal constitutional right to counsel was violated because he was not adequately warned of the limitations that would be imposed on his right and ability to represent himself. He argues specifically that he was not advised (1) that the court would limit his control over the defense to be presented, or (2) that his custody status might change and begin to impair his ability to represent himself.

No particular form of words is required in admonishing a defendant who seeks to forego the right to counsel and to represent himself. "The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1225 [259 Cal.Rptr. 669, 774 P.2d 698].)

The court repeatedly and laboriously warned defendant of the dangers of self-representation. The record as a whole establishes defendant's competency to make that decision, and he does not now raise the issue of

competency. We have concluded that the court did not impinge on defendant's ability to control the defense of his case, nor did the conditions of defendant's incarceration ever impair his ability to defend himself. Accordingly, defendant's argument is based on an inaccurate premise and cannot be sustained.

### B. *Miranda Violation*

Defendant asserts that evidence of his statements to the police was admitted in violation of his rights under *Miranda, supra,* 384 U.S. 436. Respondent would bar the claim on appeal because at trial defendant incorrectly moved to suppress the statements under section 1538.5, and because defendant failed to renew his motion to suppress when the statements were offered in evidence at trial. Respondent also argues that the statements were admissible despite any *Miranda* violation because they were offered only for impeachment. (See *Harris* v. *New York* (1971) 401 U.S. 222, 225 [28 L.Ed.2d 1, 4, 91 S.Ct. 643]; *People* v. *May* (1988) 44 Cal.3d 309, 319-320 [243 Cal.Rptr. 369, 748 P.2d 307].)[11]

It is true that a motion to suppress statements for claimed violations of Fifth and Sixth Amendment rights is not properly brought under section 1538.5. A motion under that section lies to exclude evidence obtained in violation of the right to be free from unreasonable searches and seizures. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 850-851 [268 Cal.Rptr. 802, 789 P.2d 983].)

The trial court clearly understood that defendant's claim was based on the Fifth Amendment and *Miranda, supra,* 384 U.S. 436. The court treated the motion as a nonstatutory motion to exclude under Evidence Code section 402, and we will do the same. (See *People* v. *Mattson, supra,* 50 Cal.3d at pp. 851-852.)

**(11)** It is also true that *in limine* motions to exclude evidence normally must be renewed when the evidence is introduced at trial in order to preserve the issue for appeal. (*People* v. *Morris* (1991) 53 Cal.3d 152, 189 [279 Cal.Rptr. 720, 807 P.2d 949].) Nonetheless, as the motion was advanced on a specific legal theory, was directed to a "particular, identifiable body of evidence," and the motion was made "at a time . . . when the trial judge [could] determine the evidentiary question in its appropriate context," we decline to find that the issue was waived for the purpose of appeal. (*Id.,* at p. 190; see also *People* v. *Boyer* (1989) 48 Cal.3d 247, 270, fn. 13 [256 Cal.Rptr. 96, 768 P.2d 610].)

---

[11]Defendant's claim that any error affecting the jury's evaluation of his credibility must be deemed prejudicial is not separately addressed, because we have found no such error.

■■■ Defendant made statements to the police about his movements on the day of the crime, and these were admitted in the prosecution's case-in-chief. The statements were inconsistent with other prosecution evidence; they were not merely used to impeach defendant's trial testimony, but as substantive evidence of his guilt. Thus, for example, although defendant said to the police that he had gone to a certain Sambo's restaurant at a critical time on the night of the crime, a waitress at the restaurant testified that defendant was a regular customer but that he had not been at the restaurant on the night of the crime. The jury was instructed they could rely on the statements to show consciousness of guilt. As the statements were not simply offered to impeach defendant when he testified, they do not fall within the rule that statements taken in violation of *Miranda* may be used for impeachment. (See *Harris* v. *New York, supra,* 401 U.S. at p. 225 [28 L.Ed.2d at p. 4]; *People* v. *May, supra,* 44 Cal.3d at pp. 319-320.)

The question we must resolve is whether defendant was in custody and subject to interrogation when the statements were made. The trial court found that defendant became subject to a custodial interrogation at a certain point in the interview; defendant would have us find the entire interview a custodial interrogation. ■■■ The trial court's resolution of factual disputes is to be affirmed if it is based on substantial evidence. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84]; see also *People* v. *Clair* (1992) 2 Cal.4th 629, 679 [7 Cal.Rptr.2d 564, 828 P.2d 705].) "We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." (*People* v. *Boyer, supra,* 48 Cal.3d at p. 263.)

■■■ Custody " 'occurs if the suspect is physically deprived of his freedom of action in any way or is led to believe, as a reasonable person, that he is so deprived.' " (*Green* v. *Superior Court* (1985) 40 Cal.3d 126, 133-134 [219 Cal.Rptr. 186, 707 P.2d 248], quoting *People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515]; see also *Berkemer* v. *McCarty* (1984) 468 U.S. 420, 442 [82 L.Ed.2d 317, 336, 104 S.Ct. 3138].) "In deciding the custody issue, the totality of the circumstances is relevant, and no one factor is dispositive. [Citation.] However, the most important considerations include (1) the site of the interrogation, (2) whether the investigation has focused on the subject, (3) whether the objective indicia of arrest are present, and (4) the length and form of questioning." (*People* v. *Boyer, supra,* 48 Cal.3d at p. 272.)

■■■ Testimony at the hearing on the motion to suppress showed that the officer in charge of investigating the murder of Robyn, Lieutenant Johnston

of the Baldwin Park Police Department, had some information indicating that the victim had been talking to an ice cream truck driver before her disappearance. Two ice cream truck drivers, including defendant, were asked to come to the police station for questioning. Johnston was more suspicious of the other driver, as he met the description the officer then had of the driver seen with Robyn just before she disappeared, while defendant did not. As far as Johnston knew, defendant had last seen the victim an hour or so before she disappeared. While the officer was involved in questioning the other ice cream truck driver, he asked Officer Lee, who was not involved in the investigation, to go to defendant's home in Pomona to ask him if he would come to the Pomona police station for questioning as a potential witness. Johnston steadfastly denied during the hearing that suspicion had focused on defendant at the time he was asked to come to the station. The officer considered defendant merely a potential witness, and so instructed Lee.

Lee and three other plainclothes Baldwin Park police officers arrived at defendant's trailer at 11 p.m., with guns out but not displayed. They were not homicide investigators. They drew their guns for their own protection; they were not familiar with the area and did not know what to expect. Officer Lee, who talked with defendant, had his gun hidden behind his leg. He had not been told that defendant was a suspect, and had not been told to arrest him if he refused to come to the station. Lee was told to treat defendant as a witness. Defendant was very cooperative and agreed to come in to the Pomona Police Department for an interview. He was given the choice whether to accept a ride with the police or to drive his own car. He accepted a ride and sat in the front seat with Lee, under no restraint. He was placed in an interview room in the jail section of the Pomona Police Department, because Lee was from another police department and did not know whether any other section of the Pomona police station would be open late at night. Johnston came to interview defendant in the jail section interview room because he had experienced difficulties and delays in using the nonsecure area of the police station in interviewing another witness that evening.

Defendant was interviewed by Johnston, and another Baldwin Park officer observed. Neither of them considered defendant to be in custody, and both testified that defendant could have left the interview room had he asked to. He would have needed their help to leave, as he was in a locked interview room in the secure area of the jail. Johnston asked defendant about his movements on the previous day, and defendant recounted them. He said he had seen the victim about 6 p.m., had continued on his ice cream route, and had taken a circuitous journey back to his home Pomona because he was

experiencing engine trouble. He described buying gasoline, then arriving home about 9 p.m. When defendant said that he had left his home about midnight in a borrowed turquoise car, Johnston became suspicious, as a witness had seen the victim thrown from a turquoise car in the early morning hours. The officer asked defendant whether he had any criminal record, and defendant admitted prior convictions for rape, kidnapping and child molestation. Johnston terminated the interview, which had lasted 20 or 30 minutes. He conferred with two other homicide investigators and returned to the interview room with them. They advised defendant of his *Miranda* rights, and defendant declared that he did not wish to make any further statements.

The trial court concluded that when defendant was brought to the station, he was not the focus of suspicion. The court noted the information that Johnston had at the time of the interview. This information suggested that the victim had been abducted by another man driving an ice cream truck, and that the conduct of this man when he was contacted as a witness tended to confirm Johnston's suspicions. It was only when defendant said that he had taken a turquoise car out in the early morning hours that suspicion focused on defendant, and the court suppressed statements made after that point.

The trial court's determination that suspicion focused on defendant only when he mentioned that he.had driven a turquoise car on the night of the crime is supported by substantial evidence. All the police officers involved testified that defendant was not considered a suspect until that point in the interview. Defendant was invited, not commanded, to come to the police station for an interview, and he was given the option of driving himself. As we have noted, the officers involved testified that they would have honored his refusal to come to the station, and that they would have let him go during questioning if he had so requested. Defendant did not testify at the hearing; there is no evidence that defendant felt under restraint.

Defendant disputes the accuracy of the trial court's finding, and, by implication, the truthfulness of the officers who testified at the hearing. We accept the trial court's finding on this point as supported by substantial evidence, but we also point out that at the time of the interview the police were following many leads. They had not decided that the perpetrator was probably the driver of an ice cream truck, let alone that it was defendant. They had only a small child's observation to connect the abduction to an ice cream truck driver, while an adult witness had actually seen the victim removed from a turquoise passenger car and flung into a ditch. Defendant's insistence that suspicion had focused on him because he was an ice cream truck driver who had been seen talking to the victim an hour before her abduction ignores the state of information available to the police at the time of the interview.

We also observe that the form of questioning at defendant's interview was not accusatory; the investigating officer simply asked defendant, a potential witness, to describe his movements and observations. (Cf. *Green* v. *Superior Court, supra,* 40 Cal.3d at p. 132 [questions detailed but not accusatory].) This is not a case in which officers accused defendant of involvement in the crime, or of lying about his movements, or in which the officer confronted the defendant with evidence against him (cf. *People* v. *Boyer, supra,* 48 Cal.3d at p. 272) or asked for cooperation in lieu of immediate arrest and incarceration. (Cf. *People* v. *Celaya* (1987) 191 Cal.App.3d 665, 668-669, 672 [236 Cal.Rptr. 489].) This was simply an investigation regarding a lead that had not focused suspicion on defendant. (See *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1115 [269 Cal.Rptr. 530, 790 P.2d 1327].) Defendant's answers were for the most part in a narrative form. The interview was brief.[12]

Defendant makes much of his claim that the officers who invited him to the station arrived at his door with guns in their hands. (See *People* v. *Taylor* (1986) 178 Cal.App.3d 217, 229 [223 Cal.Rptr. 638].) However, as we have noted, Officer Lee, who spoke to defendant, had his gun hidden behind his leg. The other officer who testified on the point said his gun was not drawn, but in his hand, not pointed at anyone. There is no evidence defendant saw the guns. In any case, we have said that police display of guns does not alone create a custodial situation. (*People* v. *Clair, supra,* 2 Cal.4th at p. 679.)

Defendant notes that he was on parole at the time of his encounter with the police, and that this must be considered to have strengthened his impression that he had no choice but to cooperate. But neither the officers who contacted him nor the officers who interviewed him knew he was on parole. Their conduct would not suggest to the reasonable person that they were exerting authority over him under the terms of the conditions of his parole. They solicited his voluntary cooperation, asked if he wanted to drive himself to the station, and conducted him there under no restraint. This was hardly an assertion of authority such that the reasonable person would consider there was no choice but to obey.

Although it is true that defendant was interviewed in a locked room, there is no evidence that he felt that he could not ask to leave at any point. The coercive environment of the police station is not in itself enough

---

[12]Defendant's claim that there is a conflict in the evidence about the length of the interview is not supported by the record. The evidence is that the interview took 20 or 30 minutes. After defendant mentioned the turquoise car, it took an hour or so to decide how to proceed, and to book defendant, but the length of the interview up until that point was a brief 20 or 30 minutes.

to establish that lack of freedom of movement that is essential to custody. (*California* v. *Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 103 S.Ct. 3517]; see also *Oregon* v. *Mathiason* (1977) 429 U.S. 492 [50 L.Ed.2d 714, 97 S.Ct. 711].) ▮ Officer Johnston testified that he would have released defendant upon his request up until his mention of the turquoise automobile. "Notwithstanding the lock on the interview room door, the evidence does not compel the conclusion that defendant could not have left whenever he wanted during the interview." (*Green* v. *Superior Court, supra,* 40 Cal.3d at p. 136.)

We conclude that defendant was not subject to custodial interrogation before he mentioned the turquoise car. The trial court suppressed all statements made after that point; it was not error to refuse to suppress any statement or fruit of a statement made before that point.

### C. *Failure to Preserve Evidence*

▮ Relying on *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], defendant claimed at trial that the police violated his state and federal due process rights because they failed to preserve the contents of the ice cream freezer in the ice cream truck he was driving on the night of the crime. He also claimed his due process rights were violated because police removed a gasoline sales receipt from the truck and lost it.

After a very lengthy evidentiary hearing, the trial court rejected defendant's argument and denied his motion for sanctions, but invited defendant to request cautionary jury instructions if the evidence at trial supported them.[13] Defendant did not request any jury instructions on this point.

The police seized the ice cream truck and examined it, including the freezer, for physical evidence of the victim's presence. Before they removed the contents of the freezer, they photographed most of the interior of the freezer. They found no physical evidence of the victim's presence, apart from some inconclusive evidence that the ice cream boxes were in disarray, that some boxes appeared to have been crushed, and that some ice cream appeared to have melted and refrozen. However, there was no pattern to this crushing or melting. The police criminalist did not consider retaining the freezer and its contents, but released the ice cream truck with its contents to its registered owner. He considered that the contents of the freezer could be reconstructed by using the photographs taken at the time of the search, and

---

[13]Defendant sought as a sanction a ruling that no prosecution witness could mention the condition of the ice cream boxes found in the freezer of the ice cream truck he had been driving or express an opinion whether the victim had been in the freezer.

that this would be adequate to determine whether a body had been in the freezer.

Defendant argued that failure to keep the freezer with its contents still frozen deprived him of the opportunity to examine the freezer for evidence that no body had been in it. A defense criminalist testified at the hearing on the matter that he would have numbered the ice cream boxes before removing them to search for blood and hair, and then he would have reassembled the boxes as they had been found. He would have kept the freezer in working order or would have kept the contents in some other freezer if that were not possible. As a defense criminalist, he would have examined the ice cream boxes to see if he could demonstrate that they showed no signs of crushing or melting, or other sign that a person had been deposited in the ice cream freezer.

 The state's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California* v. *Trombetta* (1984) 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 422, 104 S.Ct. 2528], fn. omitted.) This rule supersedes the standard we stated in *People* v. *Hitch, supra,* 12 Cal.3d 641. (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1233-1234 [255 Cal.Rptr. 569, 767 P.2d 1047].)

 Defendant's claim that the exculpatory value of the evidence should have been clear is misplaced. His own expert provided only speculation that the evidence *might* have proved to be of exculpatory value. " 'The mere possibility that an item of . . . information might have helped the defense . . . does not establish "materiality" in the constitutional sense.' " (*People* v. *Fauber* (1992) 2 Cal.4th 792, 829 [9 Cal.Rptr.2d 24, 831 P.2d 249], quoting *United States* v. *Agurs* (1976) 427 U.S. 97, 109-110 [49 L.Ed.2d 342, 353, 96 S.Ct. 2392].)

 Defendant argues that because the police search of the freezer uncovered no physical evidence such as blood or hair, the freezer contents must be deemed clearly exculpatory. We disagree. The exculpatory evidence that the freezer contained no trace of blood or hair or body fluid was available and before the jury. However, the evidence regarding the condition of the freezer contents was somewhat inculpatory, as there was some evidence of crushing and melting. It is not evident to us, especially given the speculative nature of the testimony of defendant's expert, that the exculpatory value of this evidence should have been clear to the police.

 Further, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Arizona* v. *Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 289, 109 S.Ct. 333].) This requirement is followed in this state. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 810-811 [281 Cal.Rptr. 90, 809 P.2d 865].) The police criminalist did not consider retaining the contents of the freezer because he was satisfied that the photographs adequately recorded the condition of the evidence. The record is devoid of evidence that the police acted in bad faith.

 As for defendant's claim that the police violated his due process rights when they lost a gasoline sales receipt they had confiscated from his truck, comparable evidence was available. The prosecution stipulated to the existence of the receipt, and the date and place of the sale. The police had a record of the receipt in the evidence log, also confirming the date and place the receipt was issued. Defendant would have had the court instruct the jury that the receipt would have showed that he bought gas at a particular time; but it is uncontroverted that the receipts from the gas station in question did not contain the time of the sale. Defendant could have contacted witnesses at the gas station to ascertain the time of the sale, but he waited almost two years to do so. By that time apparently no one remembered, but a more timely inquiry could have unearthed the evidence. Thus, comparable evidence of the time of this gasoline sale was available to defendant. In any event, again, there was no evidence that the police acted in bad faith. The receipt was simply lost, despite a major search for it in various record repositories and among the personal and business effects of persons officially connected with the case. We conclude that there was no due process violation.

### D. *Prosecutorial Misconduct*

Defendant urges that the prosecutor committed prejudicial misconduct when, in argument to the jury, he urged the jurors to imagine the victim's feelings, made improper statements regarding evidence of defendant's consciousness of guilt and his alibi defense, and vouched for the credibility of a key prosecution witness.

 There was no objection to any of these comments and any harm arising from them could have been cured by an admonition. Therefore the issue is waived on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468]; see also *People* v. *Clair, supra,* 2 Cal.4th at p. 662.)

 Even if defendant had preserved his claims, we would find no reversible error.

The prosecutor improperly appealed to the passions of the jury in urging them to consider the suffering of the victim: "Under what we are dealing with here, we are dealing with a 10-year old child who was taken from her home, taken to a place she had never been, experiencing things she had no idea how to deal with. [¶] She was degraded, violated, raped, evidence of oral sex. [¶] *Think what she must have been thinking in her last moments of consciousness during the assault.* [¶] *Think of how she might have begged or pleaded or cried.* All of those falling on deaf ears, deaf ears for one purpose and one purpose only, the pleasure of the perpetrator." (Italics added.)

We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt. (*People* v. *Fields* (1983) 35 Cal.3d 329, 362 [197 Cal.Rptr. 803, 673 P.2d 680]; see also *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1250 [278 Cal.Rptr. 640, 805 P.2d 899] [misconduct to ask jury to suppose crime had happened to their children].)

Nonetheless, we find no prejudice. The statement must be viewed in context; final argument extended over a period of four days, and this was but a single reference in a long, complex and otherwise scrupulous argument about the facts of the case. We note also that the jury deliberated for four days, and we do not believe a brief statement of this sort would sway the jury over that long a period. There is no reasonable probability that a result more favorable to defendant would have been reached in the absence of the misconduct. (*People* v. *Pensinger, supra*, 52 Cal.3d at p. 1250.)

Defendant also complains that in his attack on defendant's alibi defense, the prosecutor committed misconduct by interjecting his personal belief and experience as a prosecutor. Characterizing the defense as based upon lies and deception, the prosecutor said "that's the best case I've ever seen in any case I've ever prosecuted of intentional misrepresentation and consciousness of guilt."

The prosecutor's comment on the evidence was not inappropriate. (See *People* v. *Rich* (1988) 45 Cal.3d 1036, 1092 [248 Cal.Rptr. 510, 755 P.2d 960] [appropriate comment on the evidence to argue " 'I have never seen deliberation and premeditation like that' "].) We disagree that the jury would understand that the prosecutor was trying to sway them by referring to facts outside the record or to his own personal beliefs regarding defendant's credibility. Defendant omits the prosecutor's very next words: "And if you believe that that's what you were a witness to or subjected to, then you may consider that in deciding that Mr. Stansbury is, in fact, guilty, and that may

weigh in your decision." The prosecutor attacked defendant's alibi in argument for two days, meticulously countering every claim and bringing to light every inconsistency and falsehood. It must have been evident to the jury that it was the evidence produced at trial, not the prosecutor's experience, that demonstrated defendant's mendacity and consciousness of guilt. Indeed, the prosecutor more than once reminded the jury that his views were not controlling, but that they should consult their notes and the transcript of the trial. The jury was instructed to the same effect. We conclude that it is not reasonably likely that the jury would have understood the remarks as defendant urges. (See *People* v. *Clair, supra,* 2 Cal.4th at pp. 662-663.)

■■■ Defendant next claims the prosecutor made an improper comment on defendant's courtroom demeanor in his opening statement. (See *People* v. *Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d 629].) The prosecutor noted that the evidence was that at the time of the crime, defendant had a shaggy beard, and dirty long hair. At trial, he was clean-shaven and well dressed. The prosecutor suggested that this transformation was intended to deceive the jury and the witnesses who would be called upon to identify him. "As you sit in this courtroom right now, you are the victims, the intended targets, the recipients of another con job, if you will. Maybe not so strong. Maybe more on the subtle ground. But take a look at Mr. Stansbury right now. I invite you to look at him, his appearance, demeanor. You might expect him to be a businessman that you might meet in the street, nice three-piece suit." The prosecutor surmised that the witnesses would not be deceived, and that the defendant's primary motivation in altering his appearance was to give the jury a false impression of his character through his demeanor. He concluded: "That's not important, I suppose. It's his right. He can look and appear anyway he wants to. Just understand, that's all I'm asking, understand what's going on. Draw whatever conclusions you feel are appropriate, whatever motives you wish to ascribe, whatever significance you put. When you are here as jurors, you are here to hear and see and feel what you deem to be appropriate. . . . It will be you and you alone who will ultimately decide the facts in this case, on whatever grounds and whatever basis and whatever procedures you think to be appropriate."

Far from being the centerpiece of the prosecutor's argument, as defendant claims, this was a brief detour, halfheartedly undertaken, intended to warn the jury to disregard the defendant's appearance in evaluating his credibility. This was not a case in which the jury was arguably instructed that it could consider a nontestifying defendant's demeanor as evidence of guilt. (Compare *People* v. *Garcia* (1984) 160 Cal.App.3d 82, 90-91 [206 Cal.Rptr. 468].) The advice to ignore the defendant's demeanor and decide the case on

the basis of the evidence is not misconduct. (*People* v. *Price* (1991) 1 Cal.4th 324, 454 [3 Cal.Rptr.2d 106, 821 P.2d 610].) The suggestion that defendant was a "con man" was an appropriate comment, in colorful terms, upon the evidence to be introduced at trial. (See *People* v. *Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

 Finally, defendant makes a completely insubstantial argument that the prosecutor improperly vouched for the credibility of prosecution witness Beverly Allen. We disagree with his claim. The argument that Allen was a believable witness who had done a great deal of soul searching was a proper comment on the evidence, not an attempt on the part of the prosecutor to personally vouch for the witness's credibility. (Cf. *People* v. *Gates* (1987) 43 Cal.3d 1168, 1186-1187 [240 Cal.Rptr. 666, 743 P.2d 301].) "Argument that states the prosecutor's conclusions as to the weight of the evidence and conclusions to be drawn from it is proper." (*People* v. *Clark* (1990) 50 Cal.3d 583, 630 [268 Cal.Rptr. 399, 789 P.2d 127].) The claim that the prosecutor used the prestige of the prosecutor's office to display Allen as a strong witness is refuted by the record. The prosecutor said: "We haven't shown her any evidence . . . in this case because I wanted her to make her information as strong *or as weak* as it was going to be based on what she knew and what she knew alone." (Italics added.) We see no misconduct.

### E. *Motion for Mistrial*

 Defendant argues that the trial court erred in refusing to grant a mistrial after defendant's own witness volunteered under cross-examination that she thought he had recently been released from prison.

Patricia Jackson testified for the defense that she had accepted a ride from defendant on the night of the crime about 2 a.m. Her testimony was offered in support of his alibi defense. On cross-examination, after asking about her encounter with defendant, the prosecutor asked: "How did you find out about this case?" The witness launched into the following narrative: "Well, that particular—okay. [¶] That evening I got in. And not knowing, I was watching Channel 7 news the next day, which I still didn't put it together at the time that this was the gentleman that I had rode home with. [¶] I never did until the police came a week from then, that Thursday. [¶] And then they told me. And that like kind of confirmed that. [¶] Other than that, I seen the news and what was said and everything. [¶] And I had commented to my mother because I think the news lady had said that this particular person had just got out of prison. I'm not sure." The prosecutor interrupted: "Excuse me. [¶] Now, the question—we're getting a little ahead of ourselves, Mrs. Jackson. [¶] You said the police came by?"

After a few more questions, the court declared a recess. It instructed the witness not to say anything further about defendant having been in prison. It noted for the record that when the witness volunteered the remark about prison, the court heard Daugherty tell defendant to object. Daugherty said he had anticipated the problem, and had told defendant to object that the witness was being nonresponsive even before the damaging statement came out. Defendant explained that he had not objected because he was "hoping that because of the continuing dialogue that it would hopefully be lost." The court noted that it had had no warning that the statement was coming, and that it seemed none of the other participants had foreseen the problem. The prosecutor agreed that he had no idea the witness would make such a statement, and said that he had done his best to cut off further statements and move the witness along to another topic. He also stated that he had not seen any response from the jury to the statement. The defendant acknowledged that the prosecutor had "artfully" tried to cut the witness off. After conferring with advisory counsel, however, defendant moved for mistrial. The court heard argument but denied the motion without comment.

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776]; see also *People* v. *Cooper*, *supra*, 53 Cal.3d 771, 838-839.)

The witness's statement that she had heard defendant had been in prison was clearly improper and nonresponsive. However, the statement was brief, the witness uttered her hearsay assertion without any apparent faith in its accuracy, and the point was never touched on again. Defendant himself originally thought the statement was best left without objection, and he never did ask for any admonition to the jury to disregard it. (Cf. *People* v. *McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569].) We find no abuse of discretion in denying the motion for mistrial.

### F. *Denial of Representative Jury*

 Defendant claims that at the time of his trial, jury venires in the Pomona district of Los Angeles County were not drawn from a representative cross-section of the community, in violation of his rights under the Sixth Amendment of the United States Constitution and article I, section 16 of the California Constitution. He contends that a systematic underrepresentation of Hispanic persons and young people aged 18 to 24 was caused by excuses from service for economic hardship.

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 587, 99 S.Ct. 664] (hereafter *Duren*); see also *People* v. *Bell* (1989) 49 Cal.3d 502, 525, fn. 10 [262 Cal.Rptr. 1, 778 P.2d 129].)

As for the first prong of *Duren*, it is established that Hispanics are a distinctive group. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1160 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) We have not spoken on the question whether the young are a distinctive group; the Court of Appeal has rejected the claim a number of times (*People* v. *Henderson* (1990) 225 Cal.App.3d 1129, 1153 [275 Cal.Rptr. 837]; *People* v. *McGhee* (1987) 193 Cal.App.3d 1333, 1349, 1351-1352 [239 Cal.Rptr. 28]; *People* v. *Marbley* (1986) 181 Cal.App.3d 45, 47-48 [225 Cal.Rptr. 918]; *People* v. *Parras* (1984) 159 Cal.App.3d 875, 877 [205 Cal.Rptr. 766]; *People* v. *Estrada* (1979) 93 Cal.App.3d 76, 93 [155 Cal.Rptr. 731]), as have the majority of federal circuits. (See *Wysinger* v. *Davis* (11th Cir. 1989) 886 F.2d 295, 296, and cases cited; *United States* v. *Potter* (9th Cir. 1977) 552 F.2d 901, 905; but see *Barber* v. *Ponte* (1st Cir. 1985) 772 F.2d 982, 986-989, and cases cited.)

The parties dispute whether the second prong of *Duren* has been met. In support of his motion to quash the venire, defendant presented testimony by an expert showing an absolute disparity in Hispanic representation in four venires of 8.4 percent, and a comparative disparity of 51 percent. "We have previously noted that 'the [United States] Supreme Court has not yet spoken definitively on either the means by which disparity may be measured or the constitutional limit of permissible disparity.' " (*People* v. *Sanders* (1990) 51 Cal.3d 471, 492 [273 Cal.Rptr. 537, 797 P.2d 561], quoting *People* v. *Bell*, *supra*, 49 Cal.3d at pp. 527-528.)

We need not determine whether the exclusion of the young falls under the first prong of *Duren*, or whether defendant has shown a significant level of disparity under the second prong of *Duren*, because defendant has failed to establish a prima facie case under *Duren*'s third prong by showing that the disparity he complains of was caused by systematic exclusion.

A defendant cannot carry the burden of showing a systematic exclusion "with nothing more than statistical evidence of disparity. One must, in addition, show that the disparity is the result of an improper feature of the

jury-selection process." (*People* v. *Howard, supra,* 1 Cal.4th at p. 1160.) Defendant claims he has met this burden because his expert testified that the disparity probably arose when jurors summoned for service sought to be excused due to economic hardship.

However, defendant provided no evidence that a more lenient standard was applied to a request for excuse from service for hardship when Hispanic and young persons made the request. Such evidence is critical to defendant's claim. "While an abuse of discretion in granting excuses for hardship might, in theory, 'upset the demographic balance of the venire' [citation], defendant cannot demonstrate systematic exclusion based upon the even-handed application of a neutral criterion, such as hardship." (*People* v. *Howard, supra,* 1 Cal.4th at p. 1160; see also *People* v. *Morales* (1989) 48 Cal.3d 527, 549 [257 Cal.Rptr. 64, 770 P.2d 244].) Our review of the evidence produced at the hearing discloses that the Director of Jury Services for the Los Angeles County Superior Court attributed the underrepresentation of Hispanics primarily to the failure of those persons to respond to jury summonses, and to language problems, not to any official response to hardship excuses. Requests for hardship excuses were dealt with according to a uniform, neutral system, and there was no evidence of any lack of neutrality in administering the system for granting these excuses. The other defense expert attributed most of the underrepresentation she discovered to poverty, but did not point to any lack of neutrality in the system for granting hardship excuses. Accordingly, the trial court properly rejected defendant's motion to quash the venire.

### III. PENALTY ISSUES

#### A. *Failure to Present Case in Mitigation*

Defendant presented no evidence or argument to the jury at the penalty trial.

 Defendant urges that when a defendant who is representing himself openly states that he will seek the death penalty and refuse to introduce evidence in mitigation or argue to the jury, it is the obligation of the trial court to revoke the defendant's in propria persona status and appoint counsel to conduct the defense. In essence, he argues that the Eighth Amendment interest in a reliable penalty determination overcomes the defendant's Sixth Amendment interest in self-representation. (His argument, of course, contradicts the position he has taken with respect to the alleged interference with his right of self-representation at the guilt phase.)

Although it is true, as defendant argues, that defendant has no right to waive his automatic appeal from a death judgment (*People* v. *Massie* (1985)

40 Cal.3d 620, 624 [221 Cal.Rptr. 140, 709 P.2d 1309]), or otherwise seek the state's assistance in committing suicide, it does not follow that a defendant's right of self-representation should be circumscribed as he suggests at the penalty trial. We have consistently held that the failure to present mitigating evidence at the penalty trial does not make the proceeding unreliable in constitutional terms. (*People v. Diaz* (1992) 3 Cal.4th 495, 566 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People v. Deere* (1991) 53 Cal.3d 705, 717 [280 Cal.Rptr. 424, 808 P.2d 1181]; *People v. Lang* (1989) 49 Cal.3d 991, 1030 [264 Cal.Rptr. 386, 782 P.2d 627]; *People v. Bloom, supra,* 48 Cal.3d at p. 1228, and fn. 9.) ▇▇▇ "[A] verdict is constitutionally reliable 'when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present.'" (*People v. Diaz, supra,* 3 Cal.4th at p. 566, quoting *People v. Bloom, supra,* 48 Cal.3d at p. 1228.) ▇▇▇ Applying this standard, we must reject defendant's claim and hold that the state's interest in assuring a reliable and fair penalty trial has been met.

Defendant argues that the public policy of the state against state-assisted suicide requires reversal of any death judgment entered after the defendant refuses to put on a case in mitigation and seeks the death penalty. However, we have rejected the claim that a court necessarily abuses its discretion in granting a motion for self-representation when the stated purpose of the motion is to obtain a verdict of death, despite the fundamental public policy against state-assisted suicide. (*People v. Bloom, supra,* 48 Cal.3d at pp. 1220-1223.) The Sixth Amendment teaches that we should accord the competent defendant, even in a capital case, this much control over his destiny. (*Id.* at pp. 1222-1223.)[14]

Nor have we been convinced that self-representation under the circumstances defendant describes violates public policy. "First, defendant's proposed strategy by no means ensured the return of a death verdict. . . . [A] jury might well conclude that death was 'too good' for the defendant . . . . Second, if the trier of penalty has determined death to be the appropriate punishment, and the death judgment meets constitutional standards of reliability, the judgment cannot reasonably be regarded as the defendant's doing

---

[14]Defendant casts as a separate argument the claim that the court abused its discretion when it failed to revoke his in propria persona status, and appoint counsel with directions to put on a case in mitigation. Our understanding of the high value placed on defendant's Sixth Amendment right of self-representation causes us to reject any such obligation. (See *People v. Clark, supra,* 50 Cal.3d at p. 617, *People v. Bloom, supra,* 48 Cal.3d at pp. 1222-1224; see also *People v. Howard, supra,* 1 Cal.4th at p. 1185; *People v. Lang, supra,* 49 Cal.3d at p. 1031.)

(other than by his commission of the capital crimes) or its execution as suicide. Finally . . . defendant's argument would effectively preclude death penalty prosecution of self-represented capital defendants who decline to present mitigating evidence, as there is no effective means to compel a pro se defendant to make an affirmative penalty defense." (*People* v. *Bloom*, *supra*, 48 Cal.3d at p. 1223.)

■ Defendant argues finally that the absence of a record of mitigating evidence prevents this court from carrying out its obligation to undertake a meaningful appellate review. Any deficiency of the record, however, is defendant's own doing, and he generally cannot be heard to complain of it here. (See *People* v. *Bloom*, *supra*, 48 Cal.3d at p. 1220; see also *People* v. *Clark*, *supra*, 50 Cal.3d at p. 618.) Appellate review obviously is limited to the evidence as the parties present it, and what is omitted always goes unreviewed. Any trial record has interesting silences; defendant chose not to defend at the penalty trial, and he cannot complain now that that omission inhibits our appellate review.

### B. *Weighing Aggravating and Mitigating Circumstances*

Defendant argues next that the standard jury instruction on weighing aggravating and mitigating circumstances, like the statute it is based on, created a presumption that death was the appropriate punishment, and, in fact, actually amounted to a directed verdict of death.

The court instructed in the language of section 190.3: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State Prison for life without the possibility of parole."

Defendant claims that section 190.3 is unconstitutional on its face because it requires a death verdict despite a juror's view that death is not the appropriate punishment. This court and the United States Supreme Court have rejected this facial attack on the statute. (*Boyde* v. *California* (1990) 494 U.S. 370, 376-377 [108 L.Ed.2d 316, 326, 110 S.Ct. 1190]; *People* v. *Brown* (1985) 40 Cal.3d 512, 538-541 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

■ Similarly, we have rejected defendant's argument, based on *Adamson* v. *Ricketts* (9th Cir. 1988) 865 F.2d 1011, that the statute creates a

presumption in favor of death because every accused enters the penalty phase with a factor in aggravation—the circumstances of the crime, including the special circumstance finding. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 978-979 [281 Cal.Rptr. 273, 810 P.2d 131]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 230 [260 Cal.Rptr. 583, 776 P.2d 285].) In *Adamson* v. *Ricketts, supra,* 865 F.2d 1011, "the accused bore the burden of demonstrating that death was not an appropriate penalty. In contrast, the instruction given here merely told the jurors that if they concluded the aggravating circumstances outweighed the mitigating circumstances, they were to impose a sentence of death; but if they determined the mitigating circumstances outweighed the aggravating circumstances, they were to impose a sentence of confinement in the state prison for life without the possibility of parole." (*People* v. *Andrews, supra,* 49 Cal.3d at p. 230.) Our decision in *People* v. *Andrews, supra,* 49 Cal.3d 200 did not, contrary to defendant's contention, turn on the modifications of the standard instruction given in that case. As we have said in the past, section 190.3 requires the jury to make a determination whether aggravating circumstances "outweigh" the mitigating circumstances, and we interpret this language to direct the jury to apply normative standards in the weighing process. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Brown, supra,* 40 Cal.3d at p. 541.) Thus, far from being compelled by any presumption in favor of the death penalty, "[t]he jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death." (*People* v. *Duncan, supra,* 53 Cal.3d at p. 979.)[15]

 We have acknowledged, of course, that the instruction quoted above has the potential to mislead the jury. (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) Assuming, without deciding, the continuing vitality of *Brown* (see *People* v. *Proctor* (1992), *ante,* 499, 549, fn. 12 [15 Cal.Rptr.2d 340, 842 P.2d 1100]), we examine the record to determine whether the jury may have been misled to defendant's prejudice. (*People* v. *Pinholster, supra,* 1 Cal.4th at p. 968; *People* v. *Hayes* (1990) 52 Cal.3d 577, 642 [276 Cal.Rptr. 874, 802 P.2d 376].)

Here, nothing in the prosecutor's argument suggested that the death penalty was mandatory whether or not the jury found the penalty appropriate, nor did the prosecutor call for a mechanical process of counting rather than weighing the aggravating and mitigating factors. Nor did the prosecutor

---

[15]Defendant's reliance on *Odle* v. *Vasquez* (N.D.Cal. 1990) 754 F.Supp. 749 is unavailing; the court scanned our law without determining whether the aggravation factor contained in section 190.3, factor (a) contains a presumption in favor of death, and decided that a jury instruction telling the jury that the murder verdict was not in itself an aggravating factor dispelled any danger that the jury would consider itself bound by any such presumption.

suggest that the existence of aggravating evidence under section 190.3, factor (a) made the death penalty mandatory or presumptively appropriate. The prosecutor told the jury that it must impose the death penalty "if there are more aggravating factors or if the aggravating factors *are more important* than the mitigating factors." The prosecutor spoke of the jury's duty to impose the death penalty but only in the context of a balancing process that resulted in a conclusion that the aggravating circumstances *outweighed* the mitigating circumstances. He argued, in fact, that death was the "appropriate" penalty and that the aggravating circumstances "overwhelmed" the mitigating circumstances. The prosecutor asked the jurors to examine their souls and "follow your own inclinations."

The defense, of course, did not focus the jury's attention on any fact in mitigation, or clarify the normative nature of the weighing process mandated by section 190.3. There was no evidence or argument presented on defendant's behalf. We have never concluded, however, that the absence of a case in mitigation requires reversal under *Brown*. (See *People* v. *Howard, supra,* 1 Cal.4th at pp. 1185, 1187-1189 [no mitigating evidence or defense argument]; *People* v. *Sanders, supra,* 51 Cal.3d at pp. 521-525 [same]; see also *People* v. *Diaz, supra,* 3 Cal.3d at p. 567 [no mitigating evidence, court trial]; *People* v. *Bloom, supra,* 48 Cal.3d at p. 1230 [same, jury trial].) This was not a case like *People* v. *Crandell* (1988) 46 Cal.3d 833, 884-885 [251 Cal.Rptr. 227, 760 P.2d 423], in which the prosecutor misled the jury regarding its sentencing discretion and we reversed, relying in part on defendant's failure to present any argument to the jury. There, rebuttal was needed to dispel the misconceptions fostered by the prosecutor. (See also *People* v. *Milner* (1985) 45 Cal.3d 227, 253-256 [246 Cal.Rptr. 713, 753 P.2d 669].) Here, by contrast, the prosecutor did *not* mislead the jury, and we see no reasonable likelihood that the jury was in fact misled regarding the nature of its sentencing discretion. (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1250 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Clair, supra,* 2 Cal.4th at p. 663.)

C. *Sympathy and Mercy*

 Defendant argues that the jury may have construed the instructions, the arguments of the prosecutor and the absence of any evidence in mitigation to mean that they could not consider sympathy for the defendant in making the penalty determination.

The court was not under a duty to instruct sua sponte that sympathy for the defendant may be considered in selecting the penalty. (*People* v. *Williams* (1988) 44 Cal.3d 883, 955 [245 Cal.Rptr. 336, 751 P.2d 395].) The

court gave the expanded instruction on factor (k) of section 190.3 recommended in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813]. The instruction is "sufficient to advise the jury of the full range of mitigating evidence, and nothing more is required." (*People* v. *Edwards* (1991) 54 Cal.3d 787, 841-842 [1 Cal.Rptr.2d 696, 819 P.2d 436]; see also *People* v. *Clark, supra,* 3 Cal.4th at pp. 163-164.) As for the absence of any evidence in mitigation, this was defendant's tactical choice as counsel.

Our reading of the record discloses that the prosecutor said nothing to suggest that sympathy for the defendant based on any evidence in mitigation was, as a theoretical matter, inappropriate in making the penalty determination. He argued that no sympathy was due to the defendant, but not that sympathy or mercy were inappropriate considerations under the law.

Defendant claims that when the court delivered the guilt phase instructions, including the standard antisympathy instruction, the jury would understand that these instructions applied to the penalty phase because the court told the jury these were the instructions that applied to the case. We have held, however, that even if this instruction warning against reliance on " ' "*mere* sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" ' " is actually delivered with the penalty phase instructions, no error occurs. (*People* v. *Clark, supra,* 3 Cal.4th at p. 163; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1225 [275 Cal.Rptr. 729, 800 P.2d 1159].) "Unless misled, a reasonable jury will understand that this instruction does not foreclose compassionate evaluation of the mitigating evidence, but warns only against 'factually untethered' emotion, bias, or outside pressure." (*People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1225.)

### D. *Prosecutorial Misconduct*

 Defendant claims the prosecutor committed misconduct in closing argument to the jury by commenting on defendant's failure to express remorse or admit responsibility, and by suggesting that the absence of mitigating factors was a factor in aggravation. Respondent argues that defendant waived the claims by failing to object to any misconduct at trial; defendant argues that supporting authority had not been decided at the time of his trial, so failure to object should be excused. Generally, we do deem such objections waived for failure to object. (See e.g., *People* v. *Allison* (1989) 48 Cal.3d 879, 902-903 [258 Cal.Rptr. 208, 771 P.2d 1294].) In any event, we reject the claim on the merits. The prosecutor argued that there was no reason to extend mercy to defendant because: "There wasn't a glimmer of remorse or anything we would identity as a human thought or

feeling or anything in every incident we see of this man." Such a comment on defendant's remorselessness during and after the commission of the crime would not be understood, contrary to defendant's argument, as a comment on a nonstatutory factor in aggravation. (*People* v. *Clair, supra,* 2 Cal.4th at p. 686; *People* v. *Gallego* (1990) 52 Cal.3d 115, 197 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Carrera* (1989) 49 Cal.3d 291, 339 [261 Cal.Rptr. 348, 777 P.2d 121].) Nor is it reasonably likely the jury would have understood the prosecutor to argue that defendant's failure to confess to the charged crimes was a ground for imposing the death penalty. (See *People* v. *Clair, supra,* 2 Cal.4th at p. 686; *People* v. *Miranda* (1987) 44 Cal.3d 57, 112 [241 Cal.Rptr. 594, 744 P.2d 1127].) The prosecutor did remark that defendant had not requested forgiveness or admitted responsibility, but this was clearly in the context of the evidence of defendant's string of prior convictions for violent sex offenses, not his failure to confess to the charged crimes.

Defendant argues in a footnote that any comment on defendant's lack of remorse violated the Eighth Amendment because it interjected a subjective and speculative matter into a proceeding that must be reliably based on reason. (See *Gardner* v. *Florida* (1977) 430 U.S 349, 358 [51 L.Ed.2d 393, 402, 97 S.Ct. 1197]; *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961-962, 96 S.Ct. 2978].) It is self-evident that the Eighth Amendment, with its requirement of a reliable fact-finding process, however, does not prevent the jury from evaluating subjective states of mind. The question of the defendant's remorse calls for no more speculation than the question whether, in unadjudicated prior offenses, he had the requisite level of criminal intent, or the question whether he was suffering from extreme mental or emotional disturbance, matters that are clearly within the jury's competence.

We also reject the claim that the prosecutor argued improperly that the absence of any factor in mitigation was itself a factor in aggravation. There is not a reasonable likelihood the jury would have understood the prosecutor to be arguing as defendant suggests. Rather, the prosecutor simply argued that none of the statutory factors in mitigation was present. Thus, for example, he argued that defendant did not act under extreme mental disturbance, but in a cold and calculating manner. The prosecutor was entitled to draw on the evidence to argue that a statutory factor in mitigation was not present. (See *People* v. *Hardy* (1992) 2 Cal.4th 86, 211 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

E. *Double-counting Aggravating Factors*

■ Defendant contends the jury improperly was permitted to rely on duplicative special circumstance findings as matters in aggravation. He

claims that the rape-murder special-circumstance finding and the special circumstance finding of a murder in the course of a lewd act on a child actually described the same conduct, so that it was impermissible for the jury to rely on each as a separate aggravating factor under factor (a) of section 190.3.

We reject the premise. The rape and lewd-act special-circumstance findings required different elements of proof and could be separately considered. (*People* v. *Griffin* (1988) 46 Cal.3d 1011, 1030 [251 Cal.Rptr. 643, 761 P.2d 103] [lewd act on a child not a lesser included offense of rape].) Defendant's entire violent course of conduct was of course relevant to the penalty determination. (*People* v. *Melton* (1988) 44 Cal.3d 713, 765-769 [244 Cal.Rptr. 867, 750 P.2d 741].) In *People* v. *Melton, supra*, 44 Cal.3d 713, we explained that it was legitimate for the jury to infer that the defendant was more culpable because he not only robbed the victim but also committed a burglary in order to accomplish the robbery and murder. Each of the noncapital offenses involved violations of different interests of the victim, and were separately relevant. The same can be said of the two sex offenses in this case. (See also *People* v. *Proctor, supra, ante*, 499, 549-550; *People* v. *Mickey, supra*, 54 Cal.3d at pp. 691-692; *People* v. *Sanders, supra*, 51 Cal.3d at p. 529.)

### F. *Automatic Motion for Reconsideration*

 Defendant contends the court erred in considering evidence of the impact of the crime on the victim in ruling on the automatic motion for modification of the penalty verdict. Defendant complains that the court invited the victim's mother to speak at the hearing on the motion, and, in ruling on the motion, considered her statements about the youth of the victim and her outrage at the defendant.

Defendant relies on *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]; that authority has been largely overruled in *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597]. (*People* v. *Thomas* (1992) 2 Cal.4th 489, 535 [7 Cal.Rptr.2d 199, 828 P.2d 101].) The impact of the crime on the family of the victim is a circumstance of the crime that is relevant to the penalty determination under section 190.3, factor (a). (*People* v. *Thomas, supra*, at p. 535.) To the extent that the victim's mother spoke of matters still barred under *Booth* and *Payne*, that is, "a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence" (*Payne* v. *Tennessee, supra*, 501 U.S. __, __, fn. 2 [115 L.Ed.2d 720, 739]), we note that "the broad holding of *Booth* . . . does not extend to proceedings relating to the application for

modification of a verdict of death under section 190.4(e)." (*People* v. *Benson* (1990) 52 Cal.3d 754, 812 [276 Cal.Rptr. 827, 802 P.2d 330].) Any error in considering evidence not before the jury was nonprejudicial. (See § 190.4, subd. (e); *People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) We see no evidence the court was overcome by emotion as it considered the evidence. In the absence of evidence to the contrary, we assume the court is not affected by such extraneous evidence. (*People* v. *Fauber*, *supra*, 2 Cal.4th at p. 866.)

Defendant also claims the court erred in ruling on the motion because it double-counted aggravating factors, treated the absence of mitigating evidence as a factor in aggravation, and considered nonstatutory aggravating factors.

It is true that the court pointed to the circumstances of the charged capital crimes in aggravation twice, once under factor (a) and once under factor (b) of section 190.3. This was error. (*People* v. *Kimble* (1988) 44 Cal.3d 480, 505 [244 Cal.Rptr. 148, 749 P.2d 803].) The error, however, was harmless, as there is no indication the court arrived at its determination by counting up the aggravating factors. (See *People* v. *Karis* (1988) 46 Cal.3d 612, 652-653 [250 Cal.Rptr. 659, 758 P.2d 1189].)

The court's reference to defendant's age was not error. "Chronological age, as such, is neither aggravating nor mitigating, but age-related inferences relevant to the choice of penalty may be argued . . . . One such permissible inference is that the defendant is 'old enough to know better.' " (*People* v. *Clark*, *supra*, 3 Cal.4th 41, 170.) This was the import of the court's comment.

Contrary to defendant's claim, the court did not treat absence of evidence of extreme mental disturbance as a circumstance in aggravation. The court simply commented that defendant's cold calculation during the crimes indicated that there had been no mental disturbance. The inference to be drawn from this comment is that the court found no evidence in mitigation under factor (d) of section 190.3.

Defendant claims that the court also considered the circumstances of the crime in aggravation under section 190.3, factor (k), a factor in mitigation. The court said: "And any other circumstances [that] extenuate the gravity of the crime even though [they are] not a legal excuse for the crime. I considered that. I have considered the nature of the crime, the age of the victim, the circumstances of the victim's death. And I have considered, Mr. Stansbury, on the other side of this is the fact that you are clearly a man with

some potential. [¶] You certainly had a potential at one time in your life. You're not a stupid man. You have a basic intelligence. [¶] There are multiple tragedies. The ultimate tragedy, of course, is what happened to Robyn Jackson. [¶] The other tragedy is waste of what could have been a good mind, and that was yours, Mr. Stansbury. [¶] I have considered those and contributions that you might make or could have made."

Our reading of the record convinces us that the court referred to the circumstances of the crime as the main counterweight to the mitigation it identified under section 190.3, factor (k), that is, defendant's intelligence and sadly wasted potential. Thus the court did not indicate that the circumstances of the crime were to be considered in aggravation under both factor (a) and factor (k), but that they were the counterweight to the mitigation identified under factor (k). Further, the record in no way suggests that the court simply counted the factors in aggravation and mitigation and mechanically arrived at the result; rather, the court weighed the comparative value of the aggravating and mitigating evidence.[16]

### G. *Miscellaneous Challenges to Death Penalty Law*

Defendant challenges this state's capital sentencing scheme on several constitutional grounds. He claims that the statute and jury instructions fail to provide the sentencer with constitutionally sufficient guidance because they fail to identify for the jury what factors are aggravating and what mitigating. This claim has been rejected repeatedly. (*People* v. *Raley, supra,* 2 Cal.4th at p. 919, and cases cited.) He also relies on *Stringer* v. *Black* (1992) 503 U.S. ___ [117 L.Ed.2d 367, 112 S.Ct. 1130] to support the claim that section 190.3 is void for vagueness because it fails to guide the jury in determining whether certain factors are aggravating or mitigating. He also claims more specifically that section 190.3, factors (a) and (i) provide particularly inadequate guidance to the jury. We have recently rejected identical claims. (*People* v. *Zapien, ante,* p. 929 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People* v. *Proctor, supra, ante,* at pp. 550-551; *People* v. *Tuilaepa, ante,* 569, at p. 574 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People* v. *Noguera, ante,* 599, at pp. 648-649 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

Defendant claims that his state and federal constitutional rights were violated because the statute and instructions failed to direct the trier of fact to find beyond a reasonable doubt: (a) that the aggravating circumstances are

---

[16]Defendant also argues that the court could not consider the age of the victim under any of the statutory factors in aggravation. However, the victim's age is certainly cognizable under section 190.3, factor (a), which permits the trier of fact to consider the circumstances of the offense. (See, e.g., *People* v. *Raley* (1992) 2 Cal.4th 870, 915-916 [8 Cal.Rptr.2d 678, 830 P.2d 712].)

true; (b) that the aggravating factors outweigh the mitigating factors; and (c) that death is the appropriate sentence. We disagree. (*People* v. *Duncan, supra,* 53 Cal.3d at p. 979.) Nor do we agree that the statute is unconstitutional because it fails to direct the jury to make a finding as to what aggravating circumstances were found true. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1251-1252 [283 Cal.Rptr. 144, 812 P.2d 163], and cases cited.) We have consistently rejected his claim that the statute is unconstitutional because it fails to require jury unanimity on the aggravating factors warranting death. (*People* v. *Breaux* (1991) 1 Cal.4th 281, 321 [3 Cal.Rptr.2d 81, 821 P.2d 585], and cases cited.)

We have also rejected the claim that the relitigation at the penalty trial of the facts underlying a defendant's prior convictions violates due process or the Eighth Amendment, or double jeopardy. (*People* v. *Johnson, supra,* 3 Cal.4th at pp. 1240-1242; *People* v. *Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

 There is no constitutional requirement that the court inform the jury that the punishment of life in prison without possibility of parole will actually be carried out. (*People* v. *Pinholster, supra,* 1 Cal.4th at p. 974; *People* v. *Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217].) Nor must the jury be instructed not to consider prior criminal activity under factor (b) of section 190.3 unless it unanimously finds the activity has been proven. (*People* v. *Pinholster, supra,* 1 Cal.4th at p. 974, and cases cited.) Finally, the death penalty statute is not unconstitutional under *Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 405-406, 100 S.Ct. 1759] or *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] for failing to provide for intercase proportionality. (*People* v. *Mincey* (1992) 2 Cal.4th 408, 476 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Visciotti, supra,* 2 Cal.4th at p. 77; *People* v. *Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906].)

IV.

The judgment is affirmed in its entirety.

**KENNARD, J.,** Concurring.—The trial court in this case refused to permit the self-represented defendant to stand mute during the trial. In this respect, the case is indistinguishable from *People* v. *Clark* (1992) 3 Cal.4th 41 [10 Cal.Rptr. 554, 833 P.2d 561], in which this court held that a trial court may terminate self-representation if the pro se defendant's announced intention to stand mute is "part of a deliberate course of conduct designed to cause as much disruption as possible." (*Id.* at p. 116.) I thought this court was wrong

(see *id.* at pp. 174-180 (dis. opn. of Kennard, J.)), and I continue to think so. But repetition of dissenting views is rarely justified, and therefore I "yield to the obligation . . . to live with the law as it has been stated." (Traynor, *Some Open Questions on the Work of State Appellate Courts* (1957) 24 U.Chi.L.Rev. 211, 219; but see also Brennan, *In Defense of Dissents* (1986) 37 Hastings L.J. 427, 436-437.) On the basis of stare decisis, I concur in the majority opinion.

**MOSK, J.,** Concurring and Dissenting.—I have viewed with growing concern the capital cases under our review in which the defendant has been permitted to represent himself. I have become convinced that because of the interest of society in obtaining a reliable verdict at the guilt and penalty phases of a capital trial, the defendant should not be permitted to waive counsel and represent himself if there is the slightest doubt of his competence to undertake this awesome task in a way that discharges society's interest, as well as his own. (*People* v. *Clark* (1992) 3 Cal.4th 41, 174 [10 Cal.Rptr.2d 554, 833 P.2d 561] (dis. opn. of Mosk, J.).)

In this case, the defendant appears to be an obstreperous and cunning fool. He made it clear that his original intention was to defend in this complex circumstantial case by deliberately pointing to his prior convictions for violent sex crimes and then arguing that he had been framed because of his record. His assistant counsel and the court urged him in strong terms to abandon this strategy, since a reference to his egregious record at the guilt trial would spell his doom; any doubt the jury had about the strength of the prosecutor's case would likely evaporate. In fact, defendant did not ultimately employ this strategy, and assistant counsel maintained a hand in the defense.

Defendant now complains that the court deprived him of the right to present the defense in his own way. My years as a trial judge, an Attorney General and nearly three decades on this court have convinced me that a defendant facing the gas chamber possesses no objectivity and little competence to act as his own counsel. Here, however, the trial court properly tempered the defendant's ability to commit judicial suicide at the guilt trial by urging him to listen to assistant counsel, and by threatening to revoke his pro se status when the defendant petulantly declared he would stand mute. Because I see the hand of the court and counsel in the presentation of the defense, I would not, as I have in other cases, urge the reversal of the guilt verdict. (Compare *People* v. *Clark, supra,* 3 Cal.4th at p. 174 (dis. opn. of Mosk, J.).)

The penalty judgment, however, should be reversed.

Defendant is a manipulator who decided, contrary to the advice of his assistant counsel, to present no evidence or argument in mitigation at the penalty trial. No mitigating evidence had previously been presented at the guilt trial. Throughout the trial defendant expressed the intention to seek the death penalty if the jury found him guilty. He bitterly chastised assistant counsel and his investigators for pursuing any case in mitigation in preparation for the penalty trial. At the 11th hour he sought a 4- to 6-week continuance so that he could contact a witness to a 20-year-old crime and seek his admission that he, the witness, had committed the sex offenses of which defendant had been convicted. Defendant still maintained that he was seeking the death penalty, but wanted the evidence to be accurate. The trial court properly denied the motion for continuance; defendant had more than two years to find the witness. The record is absolutely clear that defendant stubbornly prohibited the presentation of any evidence in mitigation at the penalty trial. There is no indication that defendant was mentally impaired at the time of trial.

Having no sympathy with the efforts of the defendant to manipulate the legal system, and no question that the prosecutor, assistant counsel, defendant's investigators and the court made every effort to conduct a fair penalty trial in the face of defendant's obduracy, nevertheless I still would reverse the penalty verdict.

We should be concerned, not merely with the defendant, who appears on this one-sided record to be a despicable human being, but with the interest of society. It is society that is being asked to forfeit his life. I cannot find that our social interest in a reliable penalty verdict is safeguarded in a case in which none of the available evidence and no arguments are presented on defendant's behalf. (U.S. Const., Eighth Amend.; Cal. Const., art. I, § 17; *People* v. *Deere* (1985) 41 Cal.3d 353, 360-368 [222 Cal.Rptr. 13, 710 P.2d 925]; see also *People* v. *Diaz* (1992) 3 Cal.4th 495, 577 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (conc. & dis. opn. of Mosk, J.); *People* v. *Howard* (1992) 1 Cal.4th 1132, 1197 [5 Cal.Rptr.2d 268, 824 P.2d 1315] (conc. & dis. opn. of Mosk, J.); *People* v. *Sanders* (1990) 51 Cal.3d 471, 531-533 [273 Cal.Rptr. 537, 797 P.2d 561] (dis. opn. of Mosk, J.); *People* v. *Clark* (1990) 50 Cal.3d 583, 639-641 [268 Cal.Rptr. 399, 789 P.2d 127] (conc. & dis. opn. of Mosk, J.); *People* v. *Lang* (1989) 49 Cal.3d 991, 1059-1062 [264 Cal.Rptr. 386, 782 P.2d 627] (conc. & dis. opn. of Mosk, J.); *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1236-1245 [259 Cal.Rptr. 669, 774 P.2d 698] (conc. & dis. opn. of Mosk, J.); *People* v. *Williams* (1988) 44 Cal.3d 1127, 1158-1161 [245 Cal.Rptr. 635, 751 P.2d 901] (conc. & dis. opn. of Mosk, J.).)

There is no question that some mitigating evidence was available and could have been presented. The record reveals that assistant counsel and

defense investigators had obtained potential mitigating evidence from family members, friends and former employers who were available to say "good things" about defendant. Assistant counsel told the court at the hearing on the automatic motion for modification that "Mr. Stansbury did have a very very hard childhood, a rough childhood where he was not living with a parent or parents for a long period of time. [¶] He was incarcerated and confined in the juvenile institutions from a very very young age. [¶] He has suffered some considerable amount of ill health, including the loss of his leg. [¶] He has a great deal of bitterness against people because of those early years."

It is entirely defendant's fault that no evidence or argument was presented to the jury, but the consequence of his machinations was that 12 conscientious citizens had to decide whether he should live or die without being provided any reason to extend society's gift of mercy. While I agree with the majority that the prosecutor did not exploit ambiguity in the jury instructions in a way that would mislead the jury, the instructions themselves really made no sense in the context of this case. The references to weighing the aggravating against the mitigating factors, and to the mitigating evidence that defendant might proffer, were essentially meaningless because of the lack of a single piece of mitigating evidence. No jury should be placed in such an untenable position, and no death judgment based on such an unbalanced proceeding should be carried out.

I would remand for a new penalty trial at which defendant would be required to be represented by counsel who would have full control over the development and presentation of a case in mitigation. (See *People* v. *Clark, supra,* 50 Cal.3d at p. 641 (conc. & dis. opn. of Mosk, J.).)

Appellant's petition for a rehearing was denied May 26, 1993, and the opinion was modified to read as printed above.