Filed 10/25/23  P. v. Palacios CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061763 |
| v. | (Super. Ct. No. 04CF1972) |
| JUAN ANTONIO PALACIOS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Garey S. Paer, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

\*         \*         \*

Juan Antonio Palacios shot and killed his coworker Mario S. and then fled to Mexico. Nineteen years later, a jury found Palacios guilty of murder and found true a firearm sentencing enhancement. The trial court imposed a sentence of 40 years to life.

On appeal, Palacios claims instructional error, prosecutorial misconduct, ineffective assistance of counsel, and cumulative prejudice. We find no prejudicial errors. Thus, we affirm the judgment.


I

FACTS AND PROCEDURAL BACKGROUND

On January 4, 2003, Palacios and Mario were both working as security guards at a private party hall in Santa Ana. At the end of the night's event, they were both paid in cash in the owner's office. The owner paid Palacios and Mario each $10 per hour for six hours of work and set the money in two stacks on his desk. Palacios and Mario had a verbal argument about the money. Palacios grabbed Mario's cash, crumpled it up, and threw it on the floor. Mario picked up the $60 and kept it.

Palacios later approached Mario in his car in the parking lot and threatened to kill Mario if he was not paid the money he believed he was owed. Mario drove away in his vehicle. Another employee, Jorge H., had seen Palacios arguing with Mario. Palacios asked Jorge for a ride home. Jorge refused because Palacios was violent and upset. Jorge had seen Palacios with a gun in his waistband about a week prior.

Palacios asked Emilio P., another employee who happened to have been attending that night's event to give him a ride. Emilio was with his friend, Facundo S., whom Emilio referred to as his nephew. Emilio agreed to give Palacios a ride, and the three men left in Emilio's vehicle. Emilio had seen Palacios with a gun in his vehicle about two or three months earlier. Palacios told Emilio to take him to Mario's house because Mario owed Palacios money and he was getting paid. Emilio did not know exactly where Mario lived in Tustin because he had never been there before. Palacios

2

directed him on how to get there.

When Emilio arrived at Mario's house, Palacios told him to stop. Emilio parked on the street and Palacios got out of the vehicle. Palacios told Emilio to wait. Palacios said he was going to get his money from Mario and he would be back quickly. Palacios went to Mario's apartment and knocked on the front door. Mario's children were having a sleepover party with their friends, and Mario was talking to his wife in their bedroom, when they heard a loud knock on the front door.

Mario went to the front door and asked Palacios what he was doing there. Palacios grabbed Mario by the arm and pulled him outside. The two men were arguing in the driveway area as they were standing about three feet from one another. Palacios was telling Mario that he wanted his money. Within seconds, Palacios pulled a gun out from his waistband, pointed it at Mario's chest, and shot him. Palacios tried to shoot a second time, but the gun did not fire. Mario touched his stomach area and ran towards a driveway. Mario's family members ran outside and found Mario's lifeless body near the apartments next door.

Palacios ran back to Emilio's vehicle and got in. Palacios was nervous and "very agitated." Palacios put a gun to Emilio's stomach and told him to drive to a location in Santa Ana. Palacios told Emilio if he said anything to the police about the shooting he would kill him. Emilio eventually dropped Palacios off in Santa Ana.

At about 3:30 a.m., Palacios showed up at his brother's house. Palacios looked scared, he had a bruise on his lip, and he was carrying a small gym bag. Palacios said he needed to get to the border right away because he had just had a fight with his wife. At around 5:30 a.m., Palacios' brother dropped Palacios off in the parking lot of a San Diego area hotel located about one mile away from the border. Palacios' brother gave Palacios $100 in cash.

In 2018, police served an arrest warrant on Palacios at the Los Angeles International Airport.

3

*Court Proceedings*

In 2019, the prosecution filed an information charging Palacios with murder. (Pen. Code, § 187, subd. (a).)[1] The information further alleged that during the commission of the murder, Palacios intentionally and personally discharged a firearm causing Mario's death. (§ 12022.53, subd. (d).)

Several witnesses testified at a jury trial. Emilio said his view of the shooting was obstructed, but he could hear Mario and Palacio arguing with each other while he sat inside his car. Facundo described the shooting, which he said he could see from where he was seated in the backseat of Emilio's car.

Mario's son and daughter, who were respectively eight and nine years old at the time of the shooting, testified at trial. Both children heard Palacios knock on the door, and then saw Palacios pull their father from the apartment. They then heard "gunshots." Mario's daughter and wife went outside and eventually found Mario's body.

Mario's wife testified that after Mario came home from work, they were both in the bedroom when there was a knock on the door. Mario ran out of the bedroom and said, "'Don't open the door.'" However, Mario's wife said: "The children had already opened the door." She later turned over Mario's wallet to the police; inside were three crumpled up $20 bills.

Police officers testified they found a single shell casing at the crime scene, and later found an empty gun magazine in Palacios' home (this evidence will be covered more thoroughly in the discussion section of this opinion).

Palacios testified at the trial. He said that on the night of the shooting, Mario owed him money. Palacios testified that as Emilio drove him home from the party hall, Emilio asked why he was going home rather than to Mario's house to collect his money. Palacios said he did not know where Mario lived, but Emilio took him to Tustin

---

[1] Further undesignated statutory references are to the Penal Code.

and pointed out the apartment where Mario lived.  Palacios said he did not have a gun.  Palacios testified he was angry when he got to Mario's apartment, and he told Mario he wanted to talk.

Palacios said as they were walking out of the apartment, Mario hit him in the back of the head, causing him to fall down.  He testified Mario then grabbed him by the shirt and cussed at him.  Palacios said Mario had a dark object in his hand, which he thought was a knife or a gun.  Palacios said he was afraid for his life and tried to grab the object from Mario.  Palacios said in a struggle, the gun "went off" and shot Mario.  Palacios testified he was not sure whether he or Mario had pulled the trigger.  Palacios said he heard the gun fall to the ground.  Palacios said he fled, rather than calling the police, because he did not think the police would believe him.

On cross-examination, Palacios said he considered Emilio to be a friend, and he never had any prior problems with either Emilio or Facundo.

The jury found Palacios guilty of second degree murder; the jury did not find Palacios guilty of first degree murder (no premeditation and deliberation).  The jury found true the sentencing allegation that Palacios personally and intentionally discharged a firearm proximately causing Mario's death.  The trial court imposed a total aggregate sentence of 40 years to life.


II

DISCUSSION

Palacios claims:  A) the trial court committed instructional error; B) the prosecutor committed misconduct; C) his trial counsel provided ineffective assistance; and D) there was cumulative prejudice.  We shall address each claim.


A.  *Instructional Error Claim*

Palacios claims the trial court erred when it refused to instruct the jury on

5

involuntary manslaughter as a lesser included offense.  We agree.  However, we do not find the error to be prejudicial.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We review instructional error claims de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  We determine whether the trial court fully and fairly instructed the jury on the applicable law.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In this part of the discussion, we will:  1) review relevant legal principles on lesser included offenses as to the crime of murder; 2) summarize the trial court proceedings; and 3) apply the facts to the law.

### 1.  Relevant Legal Principles

"'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.'  [Citations.]  'That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.'  [Citations.]  'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.'"  (*People v. Souza* (2012) 54 Cal.4th 90, 115–116.)

Although there is no duty to instruct on a lesser included offense when the evidence supporting the instruction is based on mere speculation, such an instruction is required when the lesser included offense is supported by ""'evidence that a reasonable jury could find persuasive.'""  (*People v. Steskal* (2021) 11 Cal.5th 332, 345.)  This duty arises even when the lesser included offense is inconsistent with the defendant's trial theories, or contrary to the defendant's wishes.  (*People v. Breverman* (1998) 19 Cal.4th 142, 155, 162–163, ["*every* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury"].)

6

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) "For purposes of Section 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a).)

Generally, first degree murder involves the additional element of premeditation and deliberation; all other murders are of the second degree. (*People v. Chavez* (2018) 22 Cal.App.5th 663, 682.) Manslaughter (voluntary and involuntary) is a lesser included offense of murder, if supported by substantial evidence. (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) "Voluntary manslaughter can be committed without committing involuntary manslaughter, and thus the latter is not a lesser included offense of voluntary manslaughter." (*People v. Orr* (1994) 22 Cal.App.4th 780, 784.)

"When a homicide, committed with malice, is accomplished in the heat of passion or under the good faith but unreasonable belief that deadly force is required to defend oneself from imminent harm, the malice element is 'negated' or, as some have described, 'mitigated'; and the resulting crime is voluntary manslaughter, a lesser included offense of murder." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

"Involuntary manslaughter, in contrast, [is the] unlawful killing of a human being without malice. (§ 192.) It is statutorily defined as a killing occurring during the commission of 'an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) Although the statutory language appears to exclude killings committed in the course of a felony, the Supreme Court has interpreted section 192 broadly to encompass an unintentional killing in the course of a noninherently dangerous felony committed without due caution or circumspection." (*People v. Brothers*, *supra*, 236 Cal.App.4th at p. 31.)

7

Further, "an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*Brothers*, *supra*, 236 Cal.App.4th at pp. 33–34; see also *People v. Thomas* (2012) 53 Cal.4th 771, 814 ["an accidental shooting that occurs while the defendant is brandishing a firearm . . . could be involuntary manslaughter"].)

### 2. *Trial Court Proceedings*

At the conclusion of the evidence, defense counsel asked the trial court to instruct the jury on involuntary manslaughter as a lesser included offense. (CALCRIM No. 580.)[2] Counsel argued the jury could potentially find Palacios unintentionally killed Mario during an assault with a firearm: "And I think that could be the crime entered as the defendant committed a [section] 245. And I think that is something that the jurors could feasibly latch onto or conceivably think about if they were to believe that Juan Palacios is the one who showed up with a gun."

The trial court declined to give the requested involuntary manslaughter jury instruction and stated its reasoning as follows:

"This is the court's position on this. In order for there to be an involuntary manslaughter there has to be a lawful act committed by the defendant. So even based on what you just said that he showed up with a gun and he assaulted someone with a gun, that could never be deemed a lawful act.

"First of all, carrying a gun in public unless you have a CCW or license or

---

[2] "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] . . . . [¶] The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed (a crime/ [or] a lawful act in an unlawful manner); [¶] 2. The defendant committed the (crime/ [or] act) with criminal negligence; [¶] AND [¶] 3. The defendant's acts caused the death of another person." (CALCRIM No. 580.)

you're a peace officer, carrying a firearm in public that's not lawful. And certainly if you take a gun—or even without a gun you assault someone, that's not lawful. So you have to have a lawful act being performed in an unlawful manner. And I don't think there is sufficient facts in this case to warrant giving that instruction."

The trial court stated that it was going to instruct the jury on first and second degree murder, complete self-defense, imperfect self-defense (voluntary manslaughter), and heat of passion (voluntary manslaughter).

"So basically the jury is going to get like all different options. They are going to get murder in the first, murder in the second, voluntary manslaughter based on heat of passion because there was evidence to support that he was agitated and upset all arising out of the fight over the money. And then as well the instruction on voluntary manslaughter for imperfect self-defense. As well as excusable murder based on complete self-defense. I believe the instructions that I'm going to give cover all those avenues appropriately. But I do not believe that the 580 involuntary manslaughter, I don't believe there is sufficient facts in this case to warrant giving that instruction. So I'm going to refuse that instruction." (See CALCRIM No. 580.)

### 3. Analysis and Application

The trial court stated: "In order for there to be an involuntary manslaughter there has to be a *lawful* act committed by the defendant." (Italics added.) That statement was erroneous. An involuntary manslaughter (an unlawful killing without malice) can occur either during the commission of a lawful act or an unlawful act, depending on the

9

factual circumstances. (See § 192, subd. (b).)[3] In this case, we hold there was sufficient evidence to trigger the court's sua sponte duty to instruct on involuntary manslaughter (an unintentional killing) during an *unlawful* act.

During the trial, several witnesses testified Palacios was upset with Mario on the night of the shooting over the issue of money. According to the owner of the private party hall, an argument started in his office. According to other witnesses, the argument continued into the parking lot.

Emilio testified Palacios directed him to drive him to Mario's apartment for the specific purpose of collecting the money that he was owed. Emilio further testified Palacios said he was going to collect the money just before approaching Mario's apartment. Witnesses testified Palacios pulled Mario out of his apartment. Facundo testified that he saw Palacios pull his gun from his waistband and shoot Mario in the chest. Emilio testified that Palacios then immediately returned to the car with a firearm and fled from the scene. Emilio testified Palacios threatened him with the firearm.

Conversely, Palacios testified that he did not show up to Mario's apartment with a gun, Mario had a weapon and hit him over the head with it, and then the gun fired accidentally during a struggle between him and Mario.

Defense counsel's argument to the court when requesting the involuntary manslaughter instruction was essentially that the jury could have rejected some portions of Palacios' testimony, while accepting other portions. That is, the jury could have found Palacios showed up with a gun and threatened Mario (an assault with a firearm); however, the weapon may have fired accidentally during the crime. Although this theory

---

[3] "Manslaughter is the unlawful killing of a human being without malice. It is of three kinds: [¶] (a) Voluntary-upon a sudden quarrel or heat of passion. [¶] (b) Involuntary-in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. This subdivision shall not apply to acts committed in the driving of a vehicle. [¶] (c) Vehicular- . . . ." (§ 192.)

10

was internally inconsistent with Palacios' own testimony, we find the evidence taken as a whole was sufficient to support an instruction on involuntary manslaughter.[4] (See *People v. Breverman*, *supra*, 19 Cal.4th at p. 155 [the duty to instruct on lesser included offenses arises even when the lesser included offense is inconsistent with the defendant's trial theories or contrary to the defendant's wishes].)

Thus, we hold that the trial court committed instructional error by not instructing the jury on the lesser included offense of involuntary manslaughter.

However, the failure to instruct on a lesser included offense does not require "reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

"Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 177.)

In this case, there was relatively strong evidence of second degree murder,

---

[4] Indeed, the trial court instructed the jury on the defense of excusable homicide through accident. (See CALCRIM No. 510 [Excusable Homicide: Accident].) The Bench Notes to CALCRIM No. 510 state: "When this instruction is given, it should always be given in conjunction with CALCRIM No. 581, *Involuntary Manslaughter: Murder Not Charged* or CALCRIM No. 580, *Involuntary Manslaughter: Lesser Included Offense*, unless vehicular manslaughter with ordinary negligence is charged."

and comparatively weak evidence of involuntary manslaughter. Again, several witnesses testified Palacios was angry with Mario prior to the shooting. Indeed, Jorge specifically refused to give Palacios a ride because he was so violent and upset, and Jorge had recently seen Palacios with a gun in his waistband. Further, Palacios himself testified he was angry with Mario because he said that Mario owed him money.

Emilio testified that he had also seen Palacios with a gun before the night of the shooting. Emilio said that Palacios directed him to go to Mario's apartment in order to collect the money, which was in contravention of Palacios' testimony that Emilio had suggested that he go to Mario's apartment. Several witnesses testified Palacios pulled Mario out of his apartment as soon as he got to the front door. And then within seconds, Facundo described how Palacios pulled a gun from his waistband and shot Mario at point blank range in the chest. None of the other percipient witnesses saw the actual shooting, but all of their testimony is fundamentally consistent with Facundo's testimony. Palacios then immediately fled the scene by using a gun to threaten Emilio to facilitate his escape. Later that same night, Palacios fled the country with the help of his brother, who also testified during the jury trial.

None of the foregoing evidence is consistent with a finding that the shooting was the result of a mistake. And Palacios' self-serving testimony that Mario had a weapon when he left his apartment, and that Mario was the initial aggressor, was entirely at odds with all of the other percipient witness testimony. Further, Palacios said the weapon fell to the ground during the struggle with Mario, but there was no weapon found at the crime scene by the police. Moreover, there was no apparent reason for any of the percipient witnesses to lie or commit perjury.

Perhaps most significantly, the jury found the firearm sentencing allegation to be true, which required a finding that Palacios "personally and intentionally discharged a firearm proximately causing death to Mario." (See § 12022.53, subd. (d).)

The jury's true finding as to the firearm enhancement is wholly inconsistent

12

with a possible finding by the same jury that Palacios shot Mario by accident. That is, since all of the jurors unanimously concluded Palacios had *intentionally* discharged the gun causing Mario's death, they logically could not have also found Palacios *unintentionally* discharged the gun causing Mario's death. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1085–1086 ["Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions"].)

Palacios argues: "The jury could have found that appellant committed involuntary manslaughter when he intentionally discharged a firearm *without malice* 'during the course of an inherently dangerous felony.'" We disagree.

The jury found Palacios intentionally discharged a firearm causing Mario's death, which negates a finding that Palacios acted without malice (involuntary manslaughter). (See *People v. Hendricks* (1988) 44 Cal.3d 635, 643 ["'Involuntary manslaughter is . . . inherently an *unintentional* killing'"]; see also § 188, subd. (a)(1) ["Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature"].)

Palacios also argues that the jury's written questions during its deliberations support a conclusion that the court's failure to instruct on involuntary manslaughter was prejudicial. We disagree.

The jury submitted a written question to the court asking: "For implied malice, do all 4 points need to be met?" The court answered, "Yes." The jury also sought clarification about the distinction between first and second degree murder. The court largely directed the jury to the appropriate instructions. (See *People v. Chavez*, *supra*, 22 Cal.App.5th at p. 682 [generally, first degree murder involves premeditation and deliberation, and all other murders are of the second degree].)

Given the relative strength of the evidence supporting the second degree murder conviction, the relative implausibility of Palacios' testimony supporting a theory

13

of involuntary manslaughter (or accidental death), and the jury's factual finding that Palacios *personally and intentionally* discharged a firearm causing Mario's death, we do not think that the jury's questions indicate anything more than its careful consideration of the evidence, and its need for further explanation of the court's instructions.

To reiterate and conclude, we hold that the trial court erred when it refused to instruct the jury on involuntary manslaughter as lesser included offense of murder, but we do not find the error to be prejudicial. (See *In re Pratt* (1980) 112 Cal.App.3d 795, 885 [a defendant is entitled to a fair trial, not a perfect trial].)

## B. *Prosecutorial Misconduct Claim*

Palacios claims the trial court erred when it overruled an objection that the prosecutor misstated the evidence during closing argument. We disagree.

"As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) Ordinarily, "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

In this part of the discussion, we will: 1) review relevant legal principles regarding prosecutorial misconduct (or prosecutorial error); 2) summarize the trial court proceedings; and 3) apply the facts to the law.

### 1. *Relevant Legal Principles*

We evaluate claims of prosecutorial misconduct under well-established standards. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the

14

use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"'A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.'" (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.) However, "'the term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

In reviewing a prosecutor's comments to the jury, "we must view the statements in the context of the argument as a whole." (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) Generally, a prosecutor has "'wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.'" (*Ibid.*) The relevant question is "'whether there is a reasonable likelihood that the jury construed or applied any of the complained-of-remarks in an objectionable fashion.'" (*Id.* at pp. 1202–1203.)

Stating facts during closing argument that are not in evidence, "is 'clearly . . . misconduct' [citation], because such statements 'tend[] to make the prosecutor his own witness — offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence."'" (*People v. Hill*, *supra*, 17 Cal.4th at pp. 827–828.) "'Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.'" (*Ibid.*)

A prosecutor may also not mischaracterize the facts admitted during a trial. (*People v. Hill*, *supra*, 17 Cal.4th at p. 823 ["'A prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken

15

misstatements of fact'"].)  However, "'a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]  It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.'"  (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)

### 2. Trial Court Proceedings

On the night of the shooting, Detective Paul Carvo found a single expended shell casing where Mario had been shot.  At trial, Carvo explained that when a revolver type handgun is fired, the shell casing remains in the weapon, whereas with a semiautomatic handgun the shell casing is ejected.  The parties stipulated that Carvo had found a .45 caliber shell casing.  Photographs of the recovered shell casing and the crime scene were admitted into evidence.

On the day following the shooting, Detective Andrew Birozy searched Palacios' home and found within a dresser drawer "a large caliber handgun magazine that was without any bullets."  At trial, Birozy explained that a magazine is what holds the bullets in a semiautomatic handgun (as opposed to a revolver).  Photographs of the recovered gun magazine were admitted into evidence.

Palacios testified he owned a .38 revolver that he had kept in his vehicle, but the vehicle had been stolen about a week before the shooting.  Palacios said the empty magazine in his dresser drawer had been there a long time, and that he had found it under the seat of a car he had bought.  Palacios agreed the magazine was for use with a semi-automatic gun.  Palacios said he had no use for the magazine, but "simply just put it" in his dresser drawer, and he did not know why he decided to keep it.

The prosecutor challenged this portion of Palacios' testimony during the initial closing argument:

"Physical evidence of the crime refutes the defendant's account. What do we find? A .45-caliber casing. We find Mario . . . shot in the chest. What is not found? That semiautomatic firearm that supposedly fell to the ground. . . . [¶] . . . There's no gun. Why is there no gun? Because the gun man took it. . . .

"Physical evidence in the defendant's dresser drawer at his residence. What do you find? A large caliber handgun magazine for a semiautomatic firearm. What's not found? A semiautomatic firearm. Well, if you want to believe the defendant, he found that magazine, what, in a car that he bought? And then he does what everybody else does with handgun magazines that you have no use for. He just throws it in his sock and underwear drawer. That's a lie. That's a magazine for a semiautomatic handgun and there's no firearm found there. Only the magazine. Because the gun man took it."

Defense counsel replied during closing argument, stating:

"The empty magazine. You know, the People want to tell you that there is this empty magazine, and they want you to hang your hat on the empty magazine that's in [Palacios'] room. They want to tell you, oh, he just found this empty magazine and threw it in a drawer. That's just crazy. Why? Because [the prosecutor] says it is. He doesn't get to tell you that. You know, he's a mechanic. He goes through cars. He told you that he bought and sold cars. He found stuff. He kept stuff. [¶] . . . [¶]

"You had all these officers on the stand over 75 years of law enforcement experience. Over 75 years. And not a single person told you that that empty magazine had anything to do with the evidence found at [the location of the shooting]. Why? Because [the prosecutor] knows he has problems with this case and wants you to focus on things that don't matter. I would bet my keys to my house that if that empty magazine was tied to the caliber at the [shooting] location, you would have heard about that. And you didn't."

The prosecutor stated during rebuttal closing argument:

"Detective Birozy who found the magazine testified *it was a large caliber*

17

*magazine. It was a .45-caliber casing that was found at the scene.* That's not some trick. It supports what other people say about the defendant previously carrying a gun. It supports the fact that it's a semiautomatic firearm that killed Mario . . . ."

Defense counsel objected: "Objection, misstates the evidence." The trial court asked whether the attorneys wanted to approach the court and held a sidebar discussion off the record. Coming back on the record, the trial court stated that the objection was "noted and overruled at this point."

### 3. Analysis and Application

During rebuttal closing argument, the prosecutor stated that the magazine found in Palacios' home "was a large caliber magazine." This fact was admitted into evidence during the trial through the testimony of Officer Birozy. The prosecutor also stated: "It was a .45-caliber casing that was found at the scene." Detective Carvo had testified he found the shell casing at the crime scene, and it was stipulated by the parties that it was .45 caliber shell casing.

We hold the trial court did not abuse its discretion when it overruled Palacio's objection on the grounds that the prosecutor had misstated the evidence during closing argument. The prosecutor accurately summarized the evidence about the shell casing and the magazine and therefore did not misstate the evidence.

In this appeal, Palacios argues: "The prosecutor's argument clearly *implied* that the .45 caliber shell casing found at the scene of the shooting was the same type of 'large caliber' shell casing that would have been held in the magazine found in appellant's house." (Italics added.)

Palacios did not object on these grounds (improper argument) during the trial, so this claim has been forfeited for purposes of appeal. (See *People v. Brown* (2003) 31 Cal.4th 518, 553 [to avoid forfeiture of a claim of prosecutorial misconduct, a defendant generally "must make a timely objection, *make known the basis of his*

*objection*, and ask the trial court to admonish the jury," italics added].)

In any event, the prosecutor appeared to make a logical inference based on the evidence. That is, the recovered shell casing revealed Mario had likely been shot with a semiautomatic firearm, and the magazine from Palacios' bedroom reasonably suggested that Palacios may have owned a semiautomatic firearm. Further, this evidence also reasonably suggested that Palacios' testimony—about owning a revolver and about keeping a magazine in his drawer for no particular reason—was likely not credible. The jury was allowed to either accept or reject the prosecutor's interpretation of the evidence. (See *People v. Cole*, *supra*, 33 Cal.4th at p. 1203 [generally, a prosecutor has "'wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide'"].)

In sum, we find no evidence to support Palacios' claim of prosecutorial misconduct regarding the firearm shell casing and the magazine.

Palacios cites several opinions for the proposition that: "It is misconduct for a prosecutor to suggest a connection between the defendant and the crime where the connection was necessarily based on evidence not admitted at trial." (See, e.g., *People v. Evans* (1952) 39 Cal.2d 242, 251 [a knife used to attack a girl was not in evidence, "yet the district attorney referred to defendant's knife as being the same type of knife carried by the girl's attacker"].)

But the opinions cited by Palacios are inapposite because in this case there was testimonial evidence admitted at trial about the discovery of the shell casing and the magazine. Further, photographs of both of those items were admitted into evidence.

## C. *Ineffective Assistance of Counsel Claim*

Palacios claims his trial counsel provided ineffective assistance by failing to object during the prosecutor's appeals to the jury's emotions during the prosecutor's initial closing argument. We disagree.

19

The standard of review for an ineffective assistance of counsel claim is well settled. A criminal defendant has a federal and state constitutional right to the effective assistance of counsel. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.) To establish a claim of ineffective assistance of counsel, a defendant must establish both (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-688, 694-695; *People v. Benavides* (2005) 35 Cal.4th 69, 92-93.)

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)

In general, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502; see, e.g., *People v. Dickey* (2005) 35 Cal.4th 884, 914 ["the mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel"]; *People v. Boyette* (2002) 29 Cal.4th 381, 433 [same].)

"We have repeatedly stated that it is '"improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.'"'" (*People v. Sanchez* (2019) 7 Cal.5th 14, 66.) Further, "'it is misconduct to appeal to the jury to view the crime through the eyes of the victim.'" (*Ibid*.)

The prosecutor stated during the initial closing argument:

"When this case started, I heard the defense say something about the defendant's American dream. The first thing that I thought about when I heard that

20

statement was what about Mario['s] . . . American dream?  What about any dream that he had had?

"Because he was a young man.  He was 32 years old.  He was living here in that apartment in Tustin with his wife.  He had three young beautiful children.  An infant, a nine-year-old, and a ten-year-old.  He was working two jobs supporting his family.  He was doing pretty well living in Orange County, California.

"And what about his dream?  Is that the way his dreams deserved to end?  Lying at the apartment complex next door with a bullet that had ripped through his heart and his lung at the hands of the defendant, seen by his wife and daughter?  Is that the way his American dream ended over a dispute of $60?  The answer to the question is yes.  That is exactly why this happened."

During defense counsel's closing argument, she stated:

"You know what I know?  I know that Mario . . . did die from a shotgun wound on that day.  You know what I know?  I know that he has a family.  That's not lost on me.  It's not lost on me that he has kids.  It's not lost on me that the mother of his children also lost him.  Loss is always hard.  It's tragic.  It hurts.  You miss that person year after year after year, and it doesn't get easier.

"But that's not why you're here.  The reason each and every single one of you was selected on this jury is because we talked about that.  Each one of you knew that moment was going to happen in this courtroom.  You all knew that someone was going to be hurting.  But your job isn't to somehow evaluate the value of someone's loss.  That's not your job.  Your job is justice and truth.  And the People have not provided that to you.  In fact, quite the opposite.  And that's what should be insulting."

Here, the prosecutor's statements about Mario's dreams and family were

objectionable.[5]  (See *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 ["an appeal for sympathy for the victim is out of place during an objective determination of guilt"], overruled on other grounds by *Stansbury v. California* (1994) 511 U.S. 318.)

However, based on this bare appellate record, Palacios has not shown that counsel's failure to object established ineffective assistance.  Given counsel's statements addressing the loss of the victim during her closing argument, and a comment regarding the "American dream" of Palacios, which was apparently made at some point earlier in the trial, there may have been strategic or tactical reasons for defense counsel not to object to the prosecutor's comments about Mario and his family.  (See *People v. Pope* (1979) 23 Cal.3d 412, 426 [claim of ineffective assistance of counsel based on facts outside of record more properly alleged by petition for writ of habeas corpus].)

In short, Palacios has not established that his trial counsel's performance fell below an objective standard of reasonableness.  (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 686–688, 694–695; *People v. Hillhouse*, *supra*, 27 Cal.4th at p. 502 ["the failure to object will rarely establish ineffective assistance"].)  Thus, Palacios has failed to establish ineffective assistance of trial counsel on direct appeal.

Alternatively, we also find Palacios was not prejudiced.  The prosecutor's comments about Mario and his family were brief, he never returned to this line of argument, and the court just prior to closing arguments instructed the jury:  "Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."  (CALCRIM No. 222.) Had defense counsel objected to the prosecutor's improper statements, and had that objection been sustained, the trial court likely would have admonished the jury by

_____

[5] We caution the Orange County District Attorney to generally refrain from appealing to a jury's sympathies or passions.  (See *People v. Fields* (1983) 35 Cal.3d 329, 362 ["It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial"].)

essentially repeating this same jury instruction.

*D. Cumulative Prejudice Claim*

Palacios contends the cumulative prejudice of the alleged foregoing alleged errors compels reversal of his convictions. We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.) However, the rejection of each of a defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate." (*In re Reno*, at p. 483.)

Here, we found Palacios was not prejudiced by the trial court's error in refusing to instruct the jury on the lesser included offense, and we did not find the other asserted claims were meritorious.

Based on our review of the entire trial record, we do not find cumulative prejudice sufficient to undermine outcome of the trial. This is because of the considerable weight of the prosecution's evidence, the comparative weakness of the defense evidence, and the significance of the jury's true finding as to Palacios' intentional use of a firearm, as we have previously analyzed.[6] (See Discussion pt. II, A.3., *ante.*)

---

[6] We note that our analysis of the evidence in this case also included a review of all of the trial exhibits, which we had transmitted to this court from the superior court on our own motion. (See Cal. Rules of Court, rule 8.224(d).)

23

## III

## DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


DELANEY, J.